**Maribel RÍOS–JIMÉNEZ, Plaintiff, Appellant,**

v.

**Secretary of Veterans Affairs, Anthony J. PRINCIPI, et al., Defendant, Appellees.**

**No. 06–2582.**

United States Court of Appeals, First Circuit.

Heard Nov. 5, 2007.

Decided March 12, 2008.

Glenn Carl James, with whom James Law Offices was on brief, for appellant.

Mariana E. Bauzá–Almonte, Assistant United States Attorney, with whom Rosa Emilia Rodríguez–Vélez, United States Attorney, and Nelson Pérez–Sosa, Assistant United States Attorney, Chief Appellate Division, were on brief, for appellees.

Before TORRUELLA, BALDOCK,* Circuit Judges, and SMITH,** District Judge.

SMITH, District Judge.

In this case, plaintiff-appellant Maribel Ríos–Jiménez ("Ríos–Jiménez") appeals the award of summary judgment to her former employer, the Secretary of Veterans Affairs, Anthony J. Principi, in his official capacity, on her claims for disability discrimination, failure to accommodate, and hostile work environment, pursuant to the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* We conclude that summary judgment was properly granted as to each of Ríos–Jiménez's claims and affirm the decision of the district court.

## I. BACKGROUND

We first sketch with some necessary detail the undisputed facts, as outlined by the district court. Ríos–Jiménez was employed at the San Juan Veterans Administration ("VA") Medical Center as a Medical Technician in the VA Nursing Service. In 2000, she applied for and received a

---

* Of the Tenth Circuit, sitting by designation.

** Of the District of Rhode Island, sitting by designation.

temporary promotion to Health Technician with the VA Research and Development Service ("R & D Service"). In her new position, Ríos–Jiménez was assigned as Study Coordinator for a VA-funded diabetes study. Her duties and responsibilities included screening potential patients for eligibility, developing the initial database of patient information, conducting follow-up visits with patients according to a scheduling protocol, collecting data and completing study forms, recording and reporting adverse patient experiences, and performing other related duties as required by the needs of the study. Ríos–Jiménez was directly supervised by Dr. Julio Benabé, the Associate Chief of Staff for Research and Development and the study's principal investigator, and was required to work in cooperation with a study monitor and additional staff within the VA's Cooperative Studies Program Coordinating Center ("CSPCC").

By May 2001, Ríos–Jiménez had accumulated several absences for which she had not requested sick leave or compensatory time.[1] Blanca Lebrón, the Administrative Officer for the R & D Service, questioned Ríos–Jiménez about her failure to comply with attendance and timekeeping requirements, and requested that Ríos–Jiménez submit an *ex post* accounting of her absences. Ríos–Jiménez submitted two forms. The first detailed the times, dates, and justifications for 51 hours of absence; the second accounted for 108 hours of absence without explanation of

dates, times, or justifications. Both forms were signed by Dr. Benabé, who was Ríos–Jiménez's supervisor at the time. Although Dr. Benabé approved both forms, Lebrón did not accept Ríos–Jiménez's accounting for the 108 hours because it failed to provide details regarding the dates, times, and justifications for the absences. After being credited all her properly documented time, Ríos–Jiménez was left with 35 hours of unexplained absence.

Subsequently, two other employees in the study group complained that they had encountered difficulties in reaching Ríos–Jiménez. Dr. Madeline McCarren, the CSPCC's Biostatistician, complained that Ríos–Jiménez was not responsive to telephone calls, emails, or faxes, that she exhibited poor attendance on required conference calls, that she continued to make repetitive errors, and that the CSPCC staff was burdened with additional work as a result. Dr. Benabé also received an email from Dr. Carlos Abraira, Co-chairman of the diabetes study, in which Dr. Abraira described his recurring inability to contact Ríos–Jiménez and the issue of missing or incorrect data stemming from Ríos–Jiménez's failure to competently perform her duties. Based on these complaints, as well as Ríos–Jiménez's failure to comply with timekeeping requirements, Lebrón contacted the human resources department to inquire about terminating Ríos–Jiménez's temporary promotion. On September 18, 2001, Lebrón, Dr. Benabé,

1. The parties do not define "compensatory time" as it applies to the facts of this case. In our understanding of its traditional usage, the term denotes time that an employee is allowed to take off from work instead of being paid for overtime already worked. *See, e.g., Black's Law Dictionary* 305 (8th ed.2004). While compensatory time systems may vary, the salient point in this case is that Ríos–Jiménez did not comply with the timekeeping requirements established by her employer. While a properly administered compensatory time system will allow employees to take time off from work (assuming they have accumulated properly documented overtime hours), that an employee may have compensatory time available does not necessarily mean that an absence on any particular day is appropriate.

and Dr. Edwin Mejías[2] met with Ríos–Jiménez. At the meeting, Ríos–Jiménez produced two medical certificates documenting her treatment that month for anxiety, depression, and related disorders. She also produced a note from her psychiatrist stating that she was unable to work due to an emotional condition. As a result of this meeting, Lebrón informed the human resources department that it was not the right time to issue a termination letter to Ríos–Jiménez.

About a week after this meeting, Ríos–Jiménez submitted another medical certificate stating that she could continue to work provided that she was allowed a part-time schedule. Although she did begin to work part-time, her attendance continued to be erratic. Lebrón began to perform some of Ríos–Jiménez's duties, and discovered that she had a substantial amount of unfinished work stretching back over several months.[3] Consequently, on October 17, 2001, Dr. Benabé asked Dr. Mejías to terminate Ríos–Jiménez's temporary promotion. That same day, Dr. Mejías sent a memorandum to Helen Nunci, the Human Resources Manager, requesting that Ríos–Jiménez's temporary promotion be terminated. Two days later, a second meeting between Ríos–Jiménez, Lebrón, Dr. Benabé, and Dr. Mejías was held in which Dr. Benabé informed Ríos–Jiménez of the decision to transfer her back to the Nursing Service.

On November 5, Ríos–Jiménez was inadvertently issued a proposed termination letter. The letter was rescinded on November 8 and replaced with a memorandum that informed Ríos–Jiménez that her temporary promotion had been terminated and that she would be returned to her former position. On November 16, the human resources department sent Ríos–Jiménez a memorandum explaining that a temporarily promoted employee could be returned to his or her former position at any time and that the employee has no right to appeal such a decision. Also on that day, Ríos–Jiménez was informed that the termination of her temporary promotion had been pushed back until November 30, and that she was expected to report to the Nursing Service effective December 3, 2001.

On November 6, 2001, the day after Ríos–Jiménez was given the proposed termination letter (but before it was rescinded), she sent a letter to Dr. Mejías in which she requested that she be "accommodated in a reasonable manner within [her] position given the circumstances of [her] emotional state." She did not attach any medical documentation to her request or specify what she believed to be a reasonable accommodation. On November 29, Ríos–Jiménez wrote to the human resources department, complaining that she had been subjected to disability discrimination. On December 4, in response to Ríos–Jiménez's complaint, Lebrón wrote to Ms. Nunci, the Human Resources Manager, to make the following points: (1) that she believed Ríos–Jiménez was not disabled; (2) that she repeatedly had to ask Ríos–Jiménez to comply with timekeeping requirements; (3) that she never threat-

---

**2.** Dr. Mejías, the former Associate Chief of Staff for Research and Development, was not named as a defendant in the case below.

**3.** Lebrón testified that when she began to cover some of Ríos–Jiménez's duties, she discovered "piles of filing material over six months old, faxes from the Coordinating Center [CSPCC] over three months old that were unanswered, out-dated manuals and incomplete medical records." Additionally, the CSPCC had sent "three batches of work with corrections that needed to be made to patient forms, as well as requests for clarifications and for action that needed immediate attention."

ened Ríos–Jiménez and specifically told her that any communications regarding termination of her temporary position would be made by the human resources department; (4) that she told Ríos–Jiménez that she had undertaken some of Ríos–Jiménez's duties in an attempt to keep the diabetes study on track; and (5) that she informed Dr. Benabé she would cease performing Ríos–Jiménez's duties if Ríos–Jiménez was kept on the project, since Ríos–Jiménez claimed to not need Lebrón's assistance and was unable to work with or communicate with Lebrón.

On January 4, 2002, Ms. Nunci notified Ríos–Jiménez that her request for an accommodation did not meet the criteria for a reasonable accommodation because it was based only on her assertion that she suffered from an unspecified emotional condition. Ríos–Jiménez then submitted a second request for an accommodation, this time accompanied by a medical certificate from a psychiatrist recommending that her work schedule be changed to a morning schedule for at least three to six months. That same day, Ms. Nunci informed Ríos–Jiménez that the information provided by her psychiatrist did not meet the criteria for reasonable accommodation. Ríos–Jiménez was subsequently returned to her former position and lower pay grade in the Nursing Service. To challenge the revocation of her temporary promotion, Ríos–Jiménez filed this action. The defendants moved for summary judgment on all of Ríos–Jiménez's claims, and the district court granted the motions across the board. Ríos–Jiménez now appeals.

The district court also dismissed Ríos–Jiménez's claims against co-defendants Blanca Lebrón and Dr. Julio Benabé, both of whom she had sued in their individual capacity, as well as her claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the latter on the ground that the ADA does not provide for suits against the federal government. *See Castro Ortiz v. Fajardo,* 133 F.Supp.2d 143, 150–51 (D.P.R.2001); *see also Feliciano–Hill v. Principi,* 439 F.3d 18, 22 n. 1 (1st Cir.2006). Since Ríos–Jiménez has chosen not to contest these portions of the district court's decision, we need not address them.

## II. DISCUSSION

### A. The Summary Judgment Record on Review

As always, we review the district court's grant of summary judgment *de novo, Cabán Hernández v. Philip Morris USA, Inc.,* 486 F.3d 1, 8 (1st Cir.2007), and construe the record in the light most favorable to the non-movant. *Calvi v. Knox County,* 470 F.3d 422, 426 (1st Cir.2006).

At the threshold, we must deal with a procedural decision of some import rendered by the district court. In deciding the appellee's motion to dismiss and/or for summary judgment, the district court deemed admitted the appellee's statement of undisputed facts because Ríos–Jiménez's opposing statement of facts did not comply with the local rules. Those rules require a party opposing a motion for summary judgment to admit, deny, or qualify each entry in the movant's statement of material facts paragraph by paragraph and to support any denials, qualifications, or assertions of new facts by particularized citations to the record. *See* D.P.R.R. 56(c). Ríos–Jiménez argues that the district court's rejection of her opposing statement of facts was error.[4]

---

4. Ríos–Jiménez also argues that the district court erred by not considering her separate statement of additional facts. However, the district court clearly stated in its opinion that it did consider the statement of additional facts and, indeed, referred to the statement of

■ The district court properly excluded Ríos–Jiménez's opposing statement of facts and deemed admitted the appellee's version. Ríos–Jiménez failed to admit, deny, or qualify the appellee's proffered facts, choosing instead to assert that she was both "denying and/or qualifying" the vast majority. As the district court noted, in at least two instances Ríos–Jiménez admitted a fact, without qualification, only to subsequently "deny and/or qualify" that same fact.

To make matters more difficult for the district court, Ríos–Jiménez failed to use a separate paragraph to address each fact proffered by the appellee, as required by the local rule, and instead "denied and/or qualified" several facts at once. Ríos–Jiménez also "denied and/or qualified" several of the appellee's facts across several different paragraphs, i.e. the same fact may have been "denied and/or qualified" in more than one paragraph. Lastly, and importantly, she failed to include particularized citations to the record, and instead offered meandering fragments of evidence copied directly into her opposing statement. Ríos–Jiménez thus ignored the requirement of the local rule that "[a]n assertion of fact ... shall be followed by a *citation* to the *specific page or paragraph* of identified record material supporting the assertion." D.P.R.R. 56(e) (emphasis added).

Recently, in *Cabán Hernández*, we reiterated the importance of local rules similar to Local Rule 56, explaining that

[s]uch rules were inaugurated in response to this court's abiding concern that, without them, "summary judgment practice could too easily become a game of cat-and-mouse." *Ruiz Rivera v. Ri-*

*ley*, 209 F.3d 24, 28 (1st Cir.2000). Such rules are designed to function as a means of "focusing a district court's attention on what is—and what is not—genuinely controverted." *Calvi v. Knox County*, 470 F.3d 422, 427 (1st Cir.2006). When complied with, they serve "to dispel the smokescreen behind which litigants with marginal or unwinnable cases often seek to hide [and] greatly reduce the possibility that the district court will fall victim to an ambush." *Id.*

Given the vital purpose that such rules serve, litigants ignore them at their peril. In the event that a party opposing summary judgment fails to act in accordance with the rigors that such a rule imposes, a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated. *See Cosme–Rosado v. Serrano–Rodriguez*, 360 F.3d 42, 45 (1st Cir. 2004); *Ruiz Rivera*, 209 F.3d at 28. 486 F.3d at 7. We can hardly add to this admonishment but, at the risk of being redundant, we say again that parties are required to straightforwardly comply with the dictates of local rules such as Local Rule 56, and to state clearly and concisely the facts claimed to be undisputed or disputed, or qualified, and the record evidence supporting those claims. The rule does not leave room for the kind of internal contradictions, the dodging and weaving, and the double-talk that characterizes Ríos–Jiménez's filing. Local Rule 56 is intended to prevent parties from shifting to the district court the burden of sifting through the inevitable mountain of information generated by discovery in search of relevant material. Ríos–Jiménez's substantial noncompliance, if allowed, would

---

additional facts in its analysis. *See* Opinion at 3–4 ("[B]ecause Plaintiff's statement of additional facts does not run entirely afoul of the Local Rules, the Court has taken into consid-

eration Plaintiff's additional facts and the evidence in support thereof."). Therefore, we will not address this non-issue.

do just that. Should the Court excuse this blatant non-compliance, the district court would be forced to "grope unaided for factual needles in a documentary haystack." *Cabán Hernández,* 486 F.3d at 8. Consequently, we find that the district court did not abuse its discretion in deeming the appellee's statement of undisputed facts admitted. Since our review is confined to the record that was properly before the district court when it made its decision, *Mandel v. Boston Phoenix, Inc.,* 456 F.3d 198, 204 (1st Cir.2006), the question for us is whether the district court appropriately granted summary judgment based on the facts set forth in the appellee's moving papers, as well as Ríos–Jiménez's separate statement of additional facts.[5]

### B. The Claims of Discrimination and Failure to Accommodate

In response to the defendants' motion for summary judgment, Ríos–Jiménez argued unsuccessfully to the district court alternative theories: first, she contended that she had proffered direct evidence of discrimination, *see Patten v. Wal-Mart Stores East, Inc.,* 300 F.3d 21, 25 (1st Cir.2002), and was therefore entitled to a mixed motive analysis; second, she alternatively argued that she had established a prima facie case of discrimination based on the burden-shifting analysis articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). She presses both on appeal and so we will consider these contentions in turn.

#### 1. Mixed–Motive Analysis

A mixed-motive analysis is appropriate where direct evidence exists that an employer, in making an adverse employment decision, considered a proscribed factor, e.g. race or disability, as well as one or more legitimate factors, e.g. competence or performance. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 241–42, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Fernandes v. Costa Bros. Masonry, Inc.,* 199 F.3d 572, 580 (1st Cir.1999).

Ríos–Jiménez appears to argue that direct evidence of discriminatory motives was established by: (1) an August 2001 review of Ríos–Jiménez by Dr. Benabé in which he commented positively on her skill-set; (2) an email sent by Lebrón to the human resources department after the September 18, 2001 meeting, referencing a previous communication in which Lebrón had requested that Ríos–Jiménez be terminated from her temporary promotion, and stating that because of Ríos–Jiménez's emotional problems, it was not the best time to send a termination letter to her, and that Lebrón was unsure whether Ríos–Jiménez would be able to continue working; (3) a statement by Dr. Benabé to Ríos–Jiménez at the September 18, 2001 meeting that he thought Ríos–Jiménez would not be returning to work because of her depression; and (4) the forensic psychiatrist reports regarding Ríos–Jiménez's emotional difficulties.

We agree with the district court that these occurrences do not amount to

---

**5.** Ríos–Jiménez's briefing on appeal suffers from essentially the same inadequacies as the papers submitted to the district court. Rather than squarely present her arguments with citations to the record, the brief relies on bald assertions and vague, context-free, citations to factual allegations set forth earlier in the brief. *See, e.g.,* Appellant's Brief at 47–49 (purporting to establish the existence of direct evidence of disability discrimination). Although we have done our level best to understand and consider Ríos–Jiménez's arguments, we remind her that an appellant's argument *must* contain "[the] appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R.App. P. 28(a)(9)(A).

direct evidence of a discriminatory motive on the part of Ríos–Jiménez's employer. Direct evidence of discrimination "does not include stray remarks in the workplace, particularly those made by nondecision-makers or statements made by decision-makers unrelated to the decisional process itself." *Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 96 (1st Cir.1996) (citing *Price Waterhouse*, 490 U.S. at 251–52, 109 S.Ct. 1775). It also does not include statements capable of being interpreted as both discriminatory and benign. *Patten*, 300 F.3d at 25.

The review by Dr. Benabé covered the period spanning from April 1, 2000 to March 31, 2001, which predated the problems arising from Ríos–Jiménez's irregular attendance and questionable work product. Further, by Ríos–Jiménez's own admission, her disability did not develop until September 2001, well after Dr. Benabé completed his review. With respect to Lebrón's email, contrary to establishing a discriminatory intent, the communication actually negates Ríos–Jiménez's contention that her promotion was terminated because of her disability. In relevant part, the message read:

> Alida: Dr. Benabé, Dr. Mejias and myself met today with Maribel Rios and decided that it is not the best moment for the letter. She is under a severe depression and some terrible family problems that would devatate [sic] her. She is seeing a psychiatrist and we want to know if still we have the Employee assistance program that used to help this type of troubled employees [sic]. . . .
>
> . . . .
>
> I will keep you informed of this situation as we do not know if Maribel will be able to return to work.
>
> . . . .

Thank you for your continued support. If you know anything about the assistance program, please let me know.

First, the email's reference to the letter implies that a discussion had already occurred regarding the termination of Ríos–Jiménez's temporary promotion and that, as the district court reasoned, all that remained was the decision of when to notify Ríos–Jiménez. Second, even if the message could be spun as an expression of discriminatory animus, it can just as easily be read as an expression of a desire to accommodate. Lebrón's inquiry into the employee assistance program indicates that she was interested in providing some help to Ríos–Jiménez. As for Dr. Benabé's statement that Ríos–Jiménez might not return to work, the statement can fairly be construed as a benign expression of Dr. Benabé's opinion that Ríos–Jiménez might voluntarily resign. Lastly, the psychiatric reports may be evidence of Ríos–Jiménez's mental or emotional state, but they do not evidence discriminatory animus on the part of Ríos–Jiménez's employer.

In light of the foregoing, we conclude that the district court correctly found that Ríos–Jiménez was not entitled to a mixed motive analysis because she failed to present direct evidence of discrimination based on her disability.

### 2. Burden–Shifting Analysis

In evaluating whether Ríos–Jiménez has put forth a prima facie disability discrimination claim under the Rehabilitation Act, we use the well-known burden-shifting framework delineated by the Supreme Court in *McDonnell Douglas*, 411 U.S. at 792, 93 S.Ct. 1817. *See Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 104 (1st Cir.2005) (citing *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264

(1st Cir.1999)).[6] Under this approach, a plaintiff in a disability discrimination action must prove by a preponderance of the evidence that: 1) she was disabled within the meaning of the statute; 2) she was qualified to perform the essential functions of the job, either with or without a reasonable accommodation; and 3) the employer took adverse action against her because of the disability. *Bailey v. Georgia–Pacific Corp.,* 306 F.3d 1162, 1166 (1st Cir.2002); *see also McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. To make out a reasonable accommodation claim, a plaintiff must prove the first two of the above three factors and further that the employer, despite knowing about the disability, did not acquiesce to a request for a reasonable accommodation by the employee. *Calero–Cerezo v. United States Dep't of Justice,* 355 F.3d 6, 20 (1st Cir.2004).

 If, under the *McDonnell Douglas* approach, Ríos–Jiménez can establish a prima facie disability discrimination or reasonable accommodation claim by making a sufficient showing as to each of the above three factors, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision and to produce credible evidence to show that the reason advanced was the real reason. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the defendant is able to offer such a reason, the burden then shifts back to Ríos–Jiménez to establish that the proffered reason is pretext intended to conceal discriminatory intent. *Id.* at 804. The ultimate burden of proving unlawful action rests at all times with Ríos–Jiménez. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

To some degree, there is an overlap between the first two prongs in a disability discrimination claim such as this one. In the plaintiff's prima facie showing, she must show that she is qualified to perform the job; if the claim is a failure to reasonably accommodate the plaintiff's disability, it falls to the plaintiff to show that the accommodation would have enabled her to perform the essential functions of the job—and that the accommodation would have been reasonable in light of relevant factors such as expense, size of the employer, etc. In some respects, this part of the plaintiff's prima facie burden blends into the legitimate business-related reason proffered by the employer for the adverse job action. So, for example, the plaintiff-employee may claim that she was performing the essential functions of the job (or could, with an accommodation), while the defendant-employer may claim she was not (or could not, even with an accommodation). It matters less at precisely what stage of the rubric the issues get tackled; more important is that they are confronted—and here they were.

 It is uncontested that Ríos–Jiménez met her initial burden of showing that she suffered from a disability. However, the district court concluded that Ríos–Jiménez was unable to establish the second prong of the *McDonnell Douglas* prima facie analysis, i.e. she was unable to establish that she was a qualified individual able to perform the essential functions of her job, either with or without a reasonable accommodation. As an initial matter, Ríos–Jiménez did not even argue in opposition to the appellee's motion to dismiss

---

**6.** Although *McDonnell Douglas* involved a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and *Tobin* involved a claim under the ADA, the same standard of proof applies to claims under the ADA and the Rehabilitation Act. *Calero–Cerezo v. United States Dep't of Justice,* 355 F.3d 6, 11 n. 1 (1st Cir.2004) (citing *Oliveras–Sifre v. Puerto Rico Dep't of Health,* 214 F.3d 23, 25 n. 2 (1st Cir.2000)).

and/or for summary judgment that she *was* able to perform the essential functions of her job with or without reasonable accommodation.[7] However, even if we give her the benefit of the doubt, the uncontested evidence in the record establishes that she was unable to perform the essential functions of her job. At the risk of stating the obvious, attendance is an essential function of any job. *See, e.g., Waggoner v. Olin Corp.,* 169 F.3d 481, 485 (7th Cir. 1999) ("an employee who does not come to work cannot perform the essential functions of his job") (quoting *Nowak v. St. Rita High Sch.,* 142 F.3d 999, 1003 (7th Cir.1998)); *see also Rogers v. Int'l Marine Terminals, Inc.,* 87 F.3d 755, 759 (5th Cir.1996). Ríos–Jiménez frequently missed work and failed on numerous occasions to respond to attempts by the CSPCC to contact her. And, importantly, she had a spotty attendance record even after she was permitted to work part-time as recommended by her psychiatrist.[8]

Lastly, whether from the aforementioned deficiencies in communication and attendance, or for unrelated reasons, Ríos–Jiménez was unable to manage her workload, with the result being that the diabetes study was in a state of chaos that risked the study's future. In sum, Ríos–Jiménez simply could not establish that she was a qualified individual able to perform the essential functions of her job, either with or without a reasonable accommodation.[9]

■■■ To seal the conclusion here, the district court found, and we agree, that even if it assumed that Ríos–Jiménez could establish a prima facie case of discrimination, the defendant articulated a legitimate, non-discriminatory reason for terminating the temporary promotion, which went unrebutted by Ríos–Jiménez. Her substandard performance, as described by the uncontested evidence put forward by the defendant, clearly justified the grant of

7. Ríos–Jiménez does state, in her separate statement of additional facts, that with reasonable accommodation she could "perform the essential functions within her position as health technician and medical technologist/phlebotomist" and that she was a "qualified individual with a disability." However, the only evidence she provides in support of these conclusory allegations is an unsworn statement by Dr. Nerendra Patel, which essentially contains the exact same conclusory allegations without any explanation or reference to evidence. Summary judgment cannot be defeated by relying on such conclusory allegations. *Ingram v. Brink's, Inc.,* 414 F.3d 222, 228–29 (1st Cir.2005).

8. An initial recommendation that Ríos–Jiménez would benefit from returning to work part-time was made on September 25, 2001 by Dr. Reinaldo Kianes, who was Ríos–Jiménez's psychiatrist at the time. She began working a part-time schedule at about the same time, but the abbreviated schedule did not appear to put an end to the attendance and competency issues. In her unsworn statement, dated January 2, 2004, Dr. Patel recommended that Ríos–Jiménez could be

reasonably accommodated by allowing her to work part-time. This was more than two years after Ríos–Jiménez demonstrated her inability to perform the essential functions of her job even with such an accommodation.

9. Ríos–Jiménez also requested that she be given an assistant as a reasonable accommodation. We fail to see how such an accommodation would be reasonable, given that it essentially would result in a transfer of essential job functions from Ríos–Jiménez to the assistant. "An employer's obligation to make reasonable accommodations does not require the employer to rewrite the essential elements of a job description or to reallocate those functions to other workers." *Francis v. Providence Sch. Bd.,* No. C.A. 04–04–T, 2005 WL 2179149, at *5 (D.R.I. Sept. 1, 2005) (citing *Feliciano v. Rhode Island,* 160 F.3d 780, 785 (1st Cir.1998)); *see also Robertson v. Neuromedical Ctr.,* 161 F.3d 292, 295 (5th Cir. 1998) ("If [the employee] can't perform the essential functions of his job absent assigning those duties to someone else ... then [the employee] can not be reasonably accommodated as a matter of law.").

summary judgment. *See, e.g., Tobin,* 433 F.3d at 105–06 (performance deficiencies, including failure to meet minimum standards, poor attendance record, and substandard performance evaluations, were basis of legitimate, nondiscriminatory reason for adverse employment decision); *Argo v. Blue Cross & Blue Shield of Kansas, Inc.,* 452 F.3d 1193, 1202–03 (10th Cir.2006) (employee's decline in performance and persistence in arriving late, misusing his time, and failing to follow directions in spite of repeated warnings about his tardiness and "attitude" problems, were legitimate, nondiscriminatory reasons for termination); *Oates v. Discovery Zone,* 116 F.3d 1161, 1171–72 (7th Cir.1997) (evidence of repeated absenteeism and failure to follow attendance reporting procedures was fatal to employee's prima facie case of race discrimination).

## C. Hostile Work Environment

█ The district court found that Ríos–Jiménez had not put forth sufficient evidence to support a hostile work environment claim and consequently dismissed this claim. Although Ríos–Jiménez claims error, she does not provide any substantiation for her contention. Instead, she cross-references factual allegations contained in her brief and simply asserts in conclusory fashion that these allegations, as well as general statements of the law, are enough to keep her claim afloat.

█ To succeed on a hostile work environment claim, a plaintiff must show that her "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of ... employment and create an abusive working environment." *Quiles–Quiles v. Henderson,* 439 F.3d 1, 7 (1st Cir.2006) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Among the factors relevant to this inquiry are "the severity of the conduct, its frequency, and whether it unreasonably interfered with the victim's work performance." *Id.; see also Harris,* 510 U.S. at 23, 114 S.Ct. 367.

Ríos–Jiménez points to three incidents to support her claim that she was subjected to a hostile work environment: (1) a comment by Dr. Benabé during the September 18, 2001 meeting that he did not think Ríos–Jiménez was returning because of her depression; (2) Dr. Benabé privately told Ríos–Jiménez, on two occasions, that, if he were her, he would leave the R & D Service; and (3) when Ríos–Jiménez returned to work, Lebrón ignored her and told Dr. Benabé that she (Lebrón) would no longer assist the diabetes study because other studies needed her attention.

These incidents were at best isolated and offhanded, and clearly insufficient to establish a contested material issue of fact as to Ríos–Jiménez's claim of hostile work environment. Even if Dr. Benabé commented to Ríos–Jiménez that, "if he were her," he would leave the R & D Service, there is nothing particularly offensive about the statement, and there is no evidence that he uttered it publicly or in concert with others, or that his manner of communicating was in any way hostile. Additionally, Dr. Benabé made the suggestion to Ríos–Jiménez on only two occasions. Such offhand comments, uttered no more than twice, simply are not "sufficiently severe or pervasive to alter the conditions of ... employment and create an abusive working environment." *Quiles–Quiles,* 439 F.3d at 7; *see also Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citing *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)) (offhand comments and isolated incidents, unless

extremely serious, will not amount to discriminatory changes in the "terms and conditions of employment").

■ Similarly, Ríos–Jiménez did not put forward any evidence regarding Lebrón's allegedly hostile attitude, beyond the fact that Lebrón ignored her for a period of time. Even assuming Lebrón behaved as alleged, the federal employment discrimination laws do not establish a "general civility code" for the workplace. *Quiles–Quiles*, 439 F.3d at 7 (quoting *Oncale*, 523 U.S. at 81, 118 S.Ct. 998). Furthermore, Ríos–Jiménez returned to work on September 25, 2001 and was notified at the October 19, 2001 meeting that she would be transferred back to her former position at the Nursing Service, meaning any incivility on the part of Lebrón lasted less than one month. As for Lebrón's threat to Dr. Benabé, Ríos–Jiménez has made no showing that the threat was related to her alleged disability. In order to establish a contested material fact, Ríos–Jiménez was required to show that the alleged hostile conduct was directed at her "because of a characteristic protected by a federal anti-discrimination statute." *Id.* at 7–8 (citing *Oncale*, 523 U.S. at 80, 118 S.Ct. 998). Here, the uncontested facts showed that Ríos–Jiménez had an irregular attendance record and was unable to perform the duties required by her position. It was on that basis that her relationship with Lebrón apparently soured, and for which reason her temporary promotion was terminated. We find no error in the district court's finding.

## III. CONCLUSION

For the reasons set forth above, we affirm the order of the district court granting summary judgment in favor of the appellee.

*Affirmed.*