**Not for Publication in West's Federal Reporter**

# United States Court of Appeals
## For the First Circuit

No. 10-2348

MYRNA GÓMEZ-PÉREZ,

Plaintiff, Appellant,

v.

JOHN E. POTTER, Postmaster General,
United States Postal Service,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Stahl, Circuit Judges.

Edelmiro A. Salas González, with whom José L. Ramírez de Léon was on brief, for appellant.
Isabel Muñoz Acosta, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Chief, Appellate Division, and Luke Cass, Assistant United States Attorney, were on brief, for appellee.

December 22, 2011

**STAHL**, **Circuit Judge**. After the Supreme Court of the United States clarified that Plaintiff-Appellant Myrna Gómez-Pérez (Gómez) could bring a cause of action for retaliation under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-34, we remanded her case to the district court for further proceedings. Gómez now appeals the district court's grant of summary judgment for Defendant-Appellee John. E. Potter, in his official capacity as Postmaster General of the United States Postal Service (USPS), based on her failure to establish a prima facie case of retaliation. We affirm.

## I. Facts & Background

We recite the facts in the light most favorable to the party who opposed summary judgment. Rivera-Colón v. Mills, 635 F.3d 9, 10 (1st Cir. 2011). Gómez was born on May 8, 1957, and began working for the USPS in New York in 1987. In 1995, she was transferred to the Caribbean District, and after working for short periods in other post offices, Gómez landed at the Dorado Post Office in Dorado, Puerto Rico.

In October 2002, when Gómez was working as a full-time Window Distribution Clerk, she requested a transfer to the post office in Moca, Puerto Rico, to be closer to her ill mother. The transfer was approved and Gómez began work on November 2, 2002; however, her position was now called a Flexible Window Distribution Clerk and was classified as part-time. Despite the title change

and the shift from full-time to part-time, Gómez's duties in Moca were the same as they had been in Dorado. Gómez was aware that the transfer was not temporary, and that as a part-time employee, she would no longer be entitled to a forty-hour work week.

Gómez alleges that a representative from the American Postal Workers Union (Union) informed her that, despite being part-time, she was guaranteed forty hours of work per week. However, the National Collective Bargaining Agreement (CBA) between the Union and the USPS guaranteed part-time flexible (PTF) employees like Gómez only two hours per day, CBA art. 8, § 8.C, and stated that PTF employees "shall be assigned to regular schedules of less than forty (40) hours in a service week, or shall be available to work flexible hours as assigned," CBA art. 7, § 1.A.2. No USPS employee ever told Gómez she was entitled to a forty-hour work week.

After about a month in Moca, Gómez asked to transfer back to Dorado. In the meantime, her supervisor in Dorado, Onell Rivera, had initiated the process of converting her old full-time position into a part-time position and had filled it with another employee. Consequently, Rivera denied Gómez's transfer. On February 22, 2003, Gómez, who was then forty-five years old, filed

a complaint with the Equal Employment Opportunity Commission (EEOC), alleging age discrimination.[1]

Rivera informed Gómez's supervisor in Moca, Jose Antonio Cintrón (Cintrón), of the EEOC complaint at the quarterly supervisors' meeting in late February 2003. About five days later, on March 5, 2003, Cintrón held a meeting in his office with Gómez as well as two other employees, who served as witnesses. During the meeting, Cintrón discussed eight complaints about Gómez's conduct in the workplace,[2] including one for sexual harassment based on Gómez's practice of kissing male employees on the cheek each morning. Cintrón further said that he would not take sexual harassment lightly and would do whatever he could to stop it.

Later on the same day, Cintrón held a meeting with the rest of the staff to discuss sexual harassment, after which three

---

[1] Gómez had initially sought EEOC counseling on around December 19, 2002.

[2] The notes Cintrón took at the meeting described the eight complaints as the following:
    (a)  BT 600 charge
    (b)  Letters to Govt Agencies using oficial [sic] env./stamps.
    (c)  Purchase supplies w/o authorization
    (d)  Computer used different web sites (PM Office)
    (e)  Case/Alice Quinones/HC Payroll Copied/PM letter Opened (PMOffice)
    (f)  Step 3 Denied/Moca for 18 months
    (g)  Receiving Customers at Post Office on behalf of PM
    (h)  Reverse Sexual Harrassment [sic] - Morning kisses to male employees could be interpreted - touching persons.

-4-

posters discouraging sexual harassment were put up in the post office, including one in Cintrón's office. The posters were subsequently defaced, including references to Gómez's name and features. Cintrón called all employees into his office and told them he did not want to see any more altered posters. At first, Gómez was not bothered by the posters, but she later felt ridiculed.

On March 7, 2003, Cintrón held another meeting with Gómez as well as Heriberto Ramos, the Mayaguez Postmaster, who was also responsible for coordinating discipline. Gómez alleges that Ramos lectured her on both sexual harassment and violence in the workplace.[3] Ramos understood this meeting to be "pre-disciplinary," with the aim of hearing an accused party's side of the story and stopping the offensive behavior.[4] Cintrón then called a staff-wide meeting, during which he and Ramos spoke again on sexual harassment and violence in the workplace.[5]

On a number of occasions during March and April of 2003, Gómez was harassed by her co-worker, Ruben Muniz. He told her she

_____

[3] Cintrón took further notes at this meeting, which stated in part, "Violence in the workplace.  CEASE AND DESIST."

[4] The district judge and the magistrate seem to understand the meeting including the full staff to be what Ramos called "pre-disciplinary," but from our review of the record, it is unclear whether Ramos meant to refer to the first or second meeting of March 7, 2003.

[5] Gómez alleges Cintrón mentioned her name when speaking about sexual harassment.

did not belong and that she should go back to where she belonged, and he also threatened to use his position as Union representative to make her life difficult. He used profanity when speaking with Gómez.

On March 12, 2003, Gómez sent a letter to the USPS District Manager Roberto Perez de Leon, describing what she called acts of retaliation, including the sexual harassment allegation and the meetings, as well as a claim that her hours had been reduced by half. Gómez also sent a copy of this letter to the EEOC, and she later signed an affidavit supplementing her EEOC complaint to add allegations of retaliation because of her pending complaint for age discrimination. On August 20, 2003, the EEOC Compliance and Appeals Center dismissed her complaint.

Despite having alleged in her March 12 letter that her hours had been cut in half, Gómez alleges on appeal that her hours were reduced beginning March 25, falling below forty hours per week for two weeks in May, when Gómez worked 37.14 and 34.12 hours. After those two weeks, Gómez regularly worked around forty hours per week. Gómez states that she heard Cintrón tell Héctor Hermida, the employee who handled the Moca Post Office's employee scheduling, not to schedule her for more than six hours per day. Finally, Gómez states that Hermida told her to stay home on May 16 and 17, 2003, telling her that there was no work for her to do.

On November 11, 2003, Gómez filed suit against the USPS in the United States District Court for the District of Puerto Rico, alleging claims of retaliation under the ADEA. The district court granted summary judgment for the USPS on February 28, 2006, holding that the USPS had not waived sovereign immunity as to Gómez's claim. Gómez-Pérez v. Potter, No. Civ. 03-2236 (DRD), 2006 WL 488060, at *10-11 (D.P.R. Feb. 28, 2006). Gómez appealed, and we affirmed, holding that while the USPS had in fact waived sovereign immunity, Congress had not intended the federal sector provision of the ADEA "to include a cause of action for retaliation as the result of having filed an age-discrimination related complaint." Gómez-Pérez v. Potter, 476 F.3d 54, 60 (1st Cir. 2007), rev'd, 553 U.S. 474 (2008). The Supreme Court granted certiorari on the question of whether the cause of action for retaliation was contemplated by the ADEA, and holding that it was, reversed. Gómez-Pérez v. Potter, 553 U.S. 474, 477 (2008). We remanded to the district court for further proceedings. Gómez-Pérez v. Potter, 533 F.3d 19, 20 (1st Cir. 2008).

Back before the district court, the USPS again filed a motion for summary judgment, arguing that Gómez had failed to adequately establish the adverse employment action necessary to make a prima facie case of retaliation and had also not proven that

any of its actions were a pretext for retaliation.[6]  Gómez opposed the motion for summary judgment, and the district court referred the motion to a magistrate.  The magistrate issued a report and recommendation on August 27, 2010, recommending granting the motion for summary judgment, finding that Gómez had failed to establish a causal link between her engagement in protected activity and any retaliation by the USPS.  The district court, in its own opinion, found that Gómez had not shown an adverse employment action and therefore granted summary judgment for the USPS.  Gómez-Pérez v. Potter, Civ. No. 03-2236 (DRD) (D.P.R. Sept. 30, 2010).  Gómez timely appealed.

## II. Discussion

We review a district court's grant of summary judgment de novo.  Rivera-Colón, 635 F.3d at 11.  Summary judgment may be granted if the moving party is entitled to judgment as a matter of law and there is no genuine issue as to any material fact.  Fed. R. Civ. Pro. 56(c);[7] Rivera-Colón, 635 F.3d at 12.  In determining the existence of genuine issues of material fact, the court examines the record, viewing the evidence in the light most favorable to the nonmoving party.  Rivera-Colón, 635 F.3d at 12.  However,

---

[6] The USPS also argued that Gómez had failed to exhaust her administrative remedies, but that argument was deemed waived by the district court and is not before this court.

[7] Rule 56 was amended as of December 1, 2010; the substance of former Rule 56(c) now appears in Rule 56(a).

"[u]nsupported allegations and speculation do not demonstrate either entitlement to summary judgment or the existence of a genuine issue of material fact sufficient to defeat summary judgment." Id. We may affirm the grant of summary judgment on any grounds apparent in the record. Rivera-Apote v. Restaurant Metropol #3, Inc., 338 F.3d 9, 10 (1st Cir. 2003).

Gómez makes much of the district court's construction of the facts, claiming that the district court did not construe the facts in a light most favorable to her. However, even assuming that Gómez's account of the disputed facts is entirely correct, a proposition not without doubt, she cannot make out a prima facie case of retaliation. We therefore need not further discuss Gómez's factual construction claim.

On appeal, Gómez's principal claim is that the district court erred in granting summary judgment to the USPS on her ADEA retaliation claim. The federal sector provision of the ADEA provides that "[a]ll personnel actions affecting employees . . . who are at least 40 years of age . . . in the United States Postal Service . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). The phrase "discrimination based on age" "includes retaliation based on the filing of an age discrimination complaint." Gómez-Pérez, 553 U.S. at 479. The ADEA's federal sector provision was modeled on the federal sector provision of Title VII, id. at 487, and we may use standards and

precedent regarding claims under Title VII to inform our analysis of an ADEA claim under an analogous provision, Mercado v. Ritz-Carlton San Juan Hotel, 410 F.3d 41, 46 n.7 (1st Cir. 2005).

When an employee lacks direct evidence of age discrimination, we apply the burden-shifting framework laid out in McDonnell-Douglas Corporation v. Green, 411 U.S. 792, 802–05 (1973). Bonefont-Igaravidez v. Int'l Shipping Corp., 659 F.3d 120, 123-24 (1st Cir. 2011). Under this framework, the employee must first demonstrate a prima facie case of retaliation by establishing three elements: (1) the employee engaged in protected activity; (2) the employee suffered a materially adverse employment action, causing "harm, either inside or outside of the workplace"; and (3) the adverse action was causally connected to the protected activity. Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 223 (1st Cir. 2007). The employer can then overcome the prima facie case by providing evidence of a non-retaliatory reason for the employment action, but if the employee provides "evidence sufficient to raise a material issue of fact as to whether retaliation was in fact a cause of the adverse action," summary judgment may be defeated. Rivera-Colón, 635 F.3d at 12.

In this case, Gómez's act of filing the age discrimination complaint with the EEOC undoubtedly satisfies the protected activity prong of the prima facie case. See

-10-

Mariani-Colón, 511 F.3d at 223.  We examine the adverse employment action prong in greater depth.

In order to demonstrate that she was subject to an adverse employment action, Gómez "must show that a reasonable employee would have found a challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Billings v. Town of Grafton, 515 F.3d 39, 52 (1st Cir. 2008) (quoting Burlington N. & Santa Fe Ry. v. White (Burlington Northern), 548 U.S. 53, 68 (2006)).  This is an objective standard. Burlington Northern, 548 U.S. at 68. Examples of adverse employment actions include "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." Marrero v. Goya of P.R., Inc., 304 F.3d 7, 23 (1st Cir. 2002) (internal quotation marks omitted).  Neither extreme supervision and snubbing, Billings, 515 F.3d at 54 (citing Marrero, 304 F.3d at 25), nor increased criticism, id. (citing Hernandez-Torres v. Intercont'l Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998)), will satisfy the adverse employment action prong.  Further, an "employee's displeasure at a personnel action cannot, standing alone, render it materially adverse." Id. at 53 (citing Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996)).

Gómez claims that the denial of her request to transfer back to Dorado constitutes an adverse employment action. However, according to her own filings with the district court, she admits that the process of reclassifying the position as part-time and filling it with another employee was complete by November 30, 2002. Her first contact with the EEOC was not until December 2002, and her EEOC complaint was not filed until February 22, 2003. As a matter of logic, even if it constituted an adverse employment action, the denial of a transfer taking place before the protected activity occurred could not have been retaliation for engaging in that protected activity.

Gómez also claims that the meetings with Cintrón and other USPS employees, which addressed the allegations of sexual harassment against her, constituted an adverse employment action. However, these pre-disciplinary personnel actions did not rise to the level of material adversity. See Bhatti v. Trs. of Bos. Univ., 659 F.3d 64, 72 (1st Cir. 2011) (holding that reprimands without "any tangible consequences" were not materially adverse actions); Higgins v. TJX Co., 331 F. Supp. 2d 3, 7 (D. Me. 2004) (holding that counseling for minor infractions of employer's rules, coupled with personal animus from a supervisor and threat to reduce hours did not rise to the level of an adverse employment action).

Similarly, none of the individual interactions between Gómez and other USPS employees on their own amount to materially

-12-

adverse employment actions. Federal laws banning retaliation "do[] not set forth a general civility code for the American workplace," and an employee may not base a valid retaliation claim on "petty slights or minor annoyances that often take place at work and that all employees experience." Burlington Northern, 548 U.S. at 68 (internal citation and quotation marks omitted). Muniz's harassing comments fall within this category, as "[t]he workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins." Marrero, 304 F.3d at 19 (alteration in original) (internal quotation marks omitted). The alterations to the posters merit a similar analysis. While "toleration of harassment by other employees" can possibly constitute an adverse employment action, id. at 23, Cintrón immediately addressed the alterations to the posters by informing the staff that this behavior would not be tolerated. Thus, there was no adverse employment action.

Gómez additionally asserts that she was subject to a retaliatory hostile environment. "[R]etaliatory actions that are not materially adverse when considered individually may collectively amount to a retaliatory hostile work environment." Billings, 515 F.3d at 54 n.13 (citing Noviello v. City of Boston, 398 F.3d 76, 88-90 (1st Cir. 2005)). However, to amount to a hostile work environment, the alleged harassment must be "severe or

pervasive."[8]  Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 40 (1st Cir. 2003).  Gómez, in describing a number of discrete events, fails to show that any harassment she experienced was pervasive. Where an employee cannot establish pervasiveness, she carries the burden to show that the retaliatory harassment was "so severe that it rendered her work environment objectively hostile and abusive." Marrero, 304 F.3d at 26.  The sum of the meetings, posters, and comments from Muniz do not come close to meeting this high standard.

The closest question Gómez presents is her claim that her reduced hours constituted a materially adverse employment action. While it might be possible to state a claim for retaliation based on an employee's reduced hours even where she is scheduled to work more hours than she is entitled, such a claim is not made based on the record before us.  We note that Gómez has not made our task of reviewing the record easy; she has failed provide evidence regarding the hours of other PTF employees during the relevant time period and she has also failed to explain the evidence relevant to

---

[8] In determining whether harassment was "severe or pervasive," a court may consider the following factors: "the frequency and severity of the discriminatory conduct, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with the employee's work performance, and the effect of the conduct on the employee's psychological well-being."  Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 40 (1st Cir. 2003).

-14-

this argument that was provided in the record.[9]  While "[i]t is appellants' responsibility to provide the court with intelligible briefs and appendices sufficient to support their points on appeal" and we may resolve against an appellant whatever "material uncertainties result from an incomplete or indecipherable record," we proceed forward in our analysis without doing so.  Credit Francais Int'l S.A. v. Bio-Vita, Ltd., 78 F.3d 698, 700-01 (1st Cir. 1996).

The parties agree that, prior to March 2003, Gómez worked somewhat more than forty hours per week, and that her hours went down such that she worked 37.14 and then 34.12 hours for two consecutive weeks in May 2003.  Subsequently, Gómez regularly worked forty hours per week.  Gómez repeatedly argues that her hours were "cut in half," an allegation for which we can find no support in the record.  She also alleges that she heard Cintrón tell Hermida not to schedule her for more than six hours per day, and that on two occasions, Hermida told her to stay home because there was no work for her.  Gómez was entitled only to two hours of work per day under the CBA, and the CBA further stated that PTF

---

[9] Some of the evidence in the record relevant to her reduced hours argument is difficult to understand, such as the USPS's "Daily Hour Reports," which are undated and littered with indecipherable coding.  For example, it was impossible for the court to discern which report corresponded to which week or how many total hours each USPS employee had worked in a particular week.  Gómez does not point to any explanation of these reports, and if one exists in the record, we have not found it.

employees "shall be assigned to regular schedules of <u>less than</u> <u>forty (40) hours in a service week</u>." CBA art. 7, § 1.A.2 (emphasis added). Under the facts of this case, Gómez's assigned schedule of six hours per day and forty hours per week (the two seemingly anomalous weeks notwithstanding) does not amount to a materially adverse employment action. <u>Cf.</u> <u>Manning</u> v. <u>Potter</u>, 250 F. App'x 743, 746 (7th Cir. 2007) (holding that a PTF USPS employee failed to show an adverse employment action where she alleged that younger employees were "working more hours" but she was scheduled to work more than the four hours per day to which she was entitled).

Because Gómez cannot establish a materially adverse employment action and therefore fails to make out a prima facie case for retaliation, we need go no further in our analysis.

### III. Conclusion

We <u>affirm</u> the district court's grant of summary judgment.