Julio **RODRIGUEZ–FONSECA**, Plaintiff,

v.

**BAXTER HEALTHCARE CORP. OF PUERTO RICO**, Defendant.

**Civil No. 10–2010 (DRD).**

United States District Court, D. Puerto Rico.

Sept. 30, 2012.

---

Anibal Escanellas–Rivera, Escanellas & Juan, San Juan, PR, for Plaintiff.

Juan J. Casillas–Ayala, Israel Fernandez–Rodriguez, Casillas, Santiago & Torres, LLC, San Juan, PR, for Defendant.

**OPINION AND ORDER**

DANIEL R. DOMINGUEZ, District Judge.

Pending before the Court is Defendant's Motion for Summary Judgment under Rule 56 of the Federal Rules of Civil Procedure (Docket No. 25). For the reasons set forth below, the Motion for Summary Judgment is **GRANTED** and the complaint is hereby **DISMISSED** with prejudice.

**I.  PROCEDURAL BACKGROUND**

On October 18, 2010, Julio Rodriguez–Fonseca filed a complaint against his employer, Baxter Healthcare Corporation of Puerto Rico, under the Age Discrimination in Employment Act, 29 U.S.C.A. §§ 621 *et seq.* ("ADEA"), the Americans with Disabilities Act, 42 U.S.C. §§ 12201 *et seq.* ("ADA"), and the Constitution of the Unit-

ed States of America. (Docket No. 1). Plaintiff narrowed the scope of his claims in his Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, claiming he endured a hostile work environment, retaliation, and discrimination because of: 1) age, and 2) request for a reasonable accommodation for his purported disabilities. (Docket No. 37 at 1). Plaintiff requests "declaratory judgment against defendant ... find[ing] it in violation of the constitutions and laws of the United States ... and Puerto Rico," $1.5 million for compensatory damages, loss of income, back pay, front pay, loss of benefits, mental anguish, and emotional distress, punitive damages and double damages, costs and fees, reinstatement, prejudgment interest, and "such other relief as this Honorable Court deems appropriate and proper." (Docket No. 1 at 8–9).

On October 31, 2011, Defendant filed a Motion for Summary Judgment (Docket No. 25), asserting that Plaintiff's allegations failed to sufficiently establish claims for a hostile work environment and age and disability discrimination and retaliation under F.R.C.P. 56. Further, Defendant argues that Plaintiff's claims are time-barred. (Docket No. 25).

**II.  FACTUAL BACKGROUND**

Below is a summary of the events leading to the filing of the instant complaint, as alleged in the parties' statements of uncontested facts and accompanying documents thereto (Docket Nos. 25 & 37).

On October 18, 2010, Julio Rodriguez–Fonseca ("Plaintiff") brought suit against his former employer, Baxter Healthcare Corporation of Puerto Rico ("Defendant"), for age—and disability-based discrimination, retaliation, and hostile work environment.

Defendant hired Plaintiff as the Superintendent of Injection Molding on September 20, 1999, when Plaintiff was 43. (*Id.* at ¶¶ 7–9). Four years later, Defendant promoted Plaintiff, then 47, to serve as Manufacturing Manager of the Injection Molding Department. (*Id.* at ¶ 10). Plaintiff's responsibilities included supervising machinery maintenance, the manufacturing section of the Injection Molding Department, and the workshop. (*Id.* at ¶ 11–12). Plaintiff suffered from inguinal hernias for many years prior to dismissal, which required him to take leave and which Defendant always approved. (Docket No. 35, Exs. 3 at 40–41; 24–31).

While employed with Defendant, Plaintiff provided training sessions to other employees on good manufacturing and documentation practices and participated in over 300 training sessions for improving good manufacturing and documentation practices, known as GMP's and GDP's. (*Id.* at ¶¶ 15–17). Upon hire, Plaintiff received, reviewed, and accepted Defendant's employment policies. (Docket No. 25, Ex. 1 at ¶¶ 13–14). Defendant's employee handbook contains the company's rules of conduct applicable to all employees. Violations of employment terms include insubordination, OSHA violations, disobedience, abandoning the work area without authorization during working hours, and inadvertent or negligent commission of errors. (*Id.* at ¶¶ 25–26).

Defendant's employee handbook establishes a procedure for employees to address employment situations or problems, specifically providing that "if an employee feels that he/she has a situation or complaint of discrimination or harassment in the workplace, he/she should immediately notify the Human Resources Manager or designated representative for the Company to take the necessary actions, which include conducting a thorough investiga-

tion." (*Id.* at ¶ 23). Furthermore, Defendant's policy prohibits any type of retaliation against any person who has submitted or otherwise notified a complaint of discrimination or harassment, or has participated in any related investigation. (*Id.*)

Defendant operates three facilities in Jayuya, Aibonito, and Guayama, where it produces fluid therapy, anesthesia, critical care, oncology, bioscience, renal, nutrition, and specialized pharmacy materials for use in hospitals, kidney dialysis centers, doctors' offices, nursing homes, rehabilitation centers, clinical and medical research laboratories, and at home under physician supervision. (Docket No. 25, Ex. 1 at ¶¶ 2–4). Defendant's products are infused, injected, or inhaled more than two billion times annually (or six million times a day) worldwide, each time to treat a life-threatening acute or chronic condition. Patients with hemophilia, end-stage renal disease, "Primary Immune Deficiency," and a range of other diseases depend on Defendant's products on a daily basis. (*Id.* at ¶ 4).

The FDA conducts yearly inspections and audits of Defendant's facilities in Puerto Rico to ensure Defendant's compliance with applicable regulations. Defendant's failure to abide by the FDA rules may entail the imposition of sanctions that vary from monetary penalties up to the closing of a facility. (*Id.* at ¶ 29). The Injection Molding Department is a critical area of Defendant's manufacturing process because it supplies key components of pieces that feed other areas of the process. (*Id.* at ¶ 30). In the Injection Molding Department, Defendant manufactures, among other things, "Part 210," a component part used in kits for the administration of intravenous fluids to patients, which are manufactured in subsequent stages at Defendant's facilities. As such, the Injection Molding Department is a key compo-

nent because other areas of the manufacturing process feed from the injection molding process. (*Id.* at ¶ 31).

"Part 210" is manufactured through a process of injecting molding in a Swivel Mold. In order to control the temperature of this process, a liquid that works as a refrigerant is circulated through the cooling circuit of the Swivel Mold. (*Id.* at ¶ 32). Leaks in the mold, but not the Swivel Mold or the cooling system, may come in direct contact with the product. (*Id.* at ¶ 33). During March 2009, Defendant's injection molding personnel decided to use propylene glycol instead of distilled water to refrigerate and lubricate the Swivel Mold to minimize leaks. The decision was approved by Defendant's Environmental Department because propylene glycol was FDA-approved. (*Id.* at ¶¶ 34, 36). The record indicates Plaintiff learned about the approval to use propylene glycol in August 2009, though Plaintiff also claims he first learned about use of propylene glycol in September. (*Id.,* Ex. 3, at 88–90; Docket No. 35, Ex. 3 at 115). In either scenario, Plaintiff states he knew Defendant's policy for using propylene glycol before October 2009.

On Friday, October 2, 2009, Swivel Mold 210 was mounted on the machinery to begin production; however, leaks from the refrigeration liquid halted work for the weekend. (Docket No. 25, Ex. 1 at ¶ 38). On October 5, 2009, injection molding personnel noticed that the refrigeration liquid used in the Swivel Mold 210 production process did not appear to be propylene glycol. Plaintiff purportedly directed his subordinate, Alberto Zayas, to purchase car coolant and subsequently instructed employee Cristobal Colon to add 2.5 gallons of car coolant to Swivel Mold 210. (*Id.* at ¶ 39). Plaintiff disputes that he "ordered anyone to use car coolant in Swivel Mold 210," (Docket No. 37 at ¶ 40),

yet he plainly states he "ordered Zayas to purchase the ethylene glycol" to "try it out," "requested . . . information with regards to the results of the test *that he ordered to be conducted with the car coolant* on Swivel Mold 210 . . ." and accepted "responsibility" for use of the car coolant, clearly admitting he directed employees to put car coolant into the Swivel Mold 210. (*Id.* at ¶ 39; Docket No. 35, Ex. 3 at 99, 109–10.) (Emphasis added). Plaintiff admitted that using car coolant represents a health risk because it lacked FDA approval. He replied, "Of course, definitely," when asked whether it was "important for [Plaintiff] not to produce material using car coolant," and agreed that a mistake in production resulted from using car coolant. (Docket No. 35, Ex. 3 at 103–05, 121).

Defendant's personnel subsequently found production pieces contaminated with an unknown substance later adjudged as car coolant. Upon learning about the contamination, Defendant convened a multidisciplinary investigation team to determine why the Swivel Mold 210 leaked car coolant. (Docket 25, Ex. 1 at ¶ 46). Plaintiff failed to connect his directive to use the car coolant in early October 2009 with the discovered contaminated material until November 11, 2009, after a series of inquiries by various supervisors. (Docket No. 35, Ex. 3 at 123–24, 128). Plaintiff avers using car coolant in the Swivel Mold 210 constituted a "test" rather than "production," a distinction seemingly without a difference, as the "test" nonetheless yielded leakage of an unapproved substance. *Id.*

On November 11, 2009, Plaintiff met with his immediate supervisor, Carlos Arroyo ("Arroyo"), to discuss the coolant use, and Arroyo requested that Plaintiff document the sequence of events in a report. (*Id.* at 129). Plaintiff asserts that, throughout his tenure with the company,

Arroyo referred to him as a "crazy, little, old man," or a similar combination of such pejorative adjectives, whenever they encountered one another. (*Id.* at 25–26, 45–46, 50). Plaintiff also recollects that Arroyo exerted intense pressure on him, but refers to the pressure as "work-related" or "work pressure" because Arroyo "wanted everything in the department to flow like he wanted it to flow." (*Id.* at 46). Arroyo supposedly "put pressure on [Plaintiff] so that everything in the department would run like a clock. That it would run perfect, it would run well." (*Id.* at 56). Plaintiff claims Arroyo harassed him because he told him "you have to do this, this has to be done," and took offense to the authoritarian way Arroyo addressed him. (*Id.* at 26, 60–62). Arroyo informed Plaintiff he would "be on [Plaintiff's] case to learn" molding techniques, since Arroyo was unfamiliar with the practice. (*Id.* at 25). Plaintiff found Arroyo "uncivilized" because he "was always saying foul words," which "reverberated in [Plaintiff]." (*Id.* at 49). Plaintiff believed Arroyo would terminate him following their meeting, "got stumped" and "went blank" in his failed effort to fill out the report, and left Defendant's premises due to illness, informing only a subordinate. (*Id.* at 77–78, 82, 129–30).

Defendant subsequently sent Plaintiff a letter requesting Plaintiff's appearance at a follow-up investigation of the contamination, scheduled for December 9, 2009. On December 1, 2009, Plaintiff sent Defendant's infirmary a physician's diagnosis stating that he would be "convalescing" from severe depression until March 2010. (Docket 45, Ex. 4). Plaintiff claims this correspondence and his supervisors' knowledge of his "medical condition" suffice for a request for a reasonable accommodation under the Americans with Disabilities Act, and admits he did not follow the company policy, of which he was aware, for reasonable accommodation requests. (Docket No. 45, Ex. 3 at 63–64, 71). Plaintiff also asserts he requested reasonable accommodations from his employers "all the times [he] was sick" from his hernia and that Defendant gave Plaintiff all the leave needed to convalesce from hernia surgery. (*Id.* at 64). Defendant terminated Plaintiff's employment on December 23, 2009, effective December 29, 2009, asserting that Plaintiff's negligence and breach of company policy provided just cause for the dismissal. (Docket No. 35, Ex. 18). Arroyo signed the termination letter, yet Defendant claims Arroyo's supervisor, Enrique Moran, decided to terminate Plaintiff. (*Id.*; Docket No. 25, Defendant's Supplement Statement of Uncontested Facts at ¶ 58). The Court therefore considers these facts and those in the record in assessing Defendant's Motion for Summary Judgment.

## III. SUMMARY JUDGMENT

A motion for summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which entitles a party to judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." *See Prescott v. Higgins*, 538 F.3d 32, 40 (1st Cir.2008) (citing *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir.2008)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Calero—Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir.2004) (stating that an issue is genuine if it can be resolved in favor of either party). In order for a disputed fact to be considered "material" it must have the potential "to

affect the outcome of the suit under governing law." *Sands v. Ridefilm Corp.*, 212 F.3d 657, 660–661 (1st Cir.2000) (citing *Liberty Lobby, Inc.*, 477 U.S. at 247–248, 106 S.Ct. 2505); *Prescott*, 538 F.3d at 40 (citing *Maymí v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir.2008)).

The principle of the summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir.1997) (citing Fed.R.Civ.P. 56(e) advisory committee note to the 1963 Amendment). The moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact on the record. *Shalala*, 124 F.3d at 306. Upon a showing by the moving party of an absence of a genuine issue of material fact, the burden shifts to the nonmoving party to demonstrate that a trier of fact could reasonably find in his favor. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The non-movant may not defeat a "properly focused motion for summary judgment by relying upon mere allegations," but rather through definite and competent evidence. *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir.1994). The non-movant's burden thus encompasses a showing of "at least one fact issue which is both 'genuine' and 'material.'" *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990); *see also Suarez v. Pueblo Int'l*, 229 F.3d 49, 53 (1st Cir.2000) (stating that a non-movant may shut down a summary judgment motion only upon a showing that a trial-worthy issue exists). As a result, the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." *Liberty Lobby, Inc.*, 477 U.S. at 247–248, 106 S.Ct. 2505. Similarly, "summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

When considering a motion for summary judgment, the Court must examine the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor in order to conclude whether or not there is sufficient evidence in favor of the non-movant for a jury to return a verdict in its favor. *Rochester Ford Sales, Inc. v. Ford Motor Co.*, 287 F.3d 32, 38 (1st Cir.2002). The Court must review the record as a whole and refrain from engaging in an assessment of credibility or weigh the evidence presented. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 135, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The burden placed upon the non-movant is one of production rather than persuasion. In other words, in weighing a non-movant's opposition to summary judgment the Court should not engage in jury-like functions related to the determination of credibility.

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prod.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Summary judgment is inappropriate where there are issues of motive and intent as related to material facts. *See Poller v. Columbia Broad. Sys.*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (summary judgment is to be issued "sparingly" in litigation "where motive and intent play leading roles"); *see also Pullman–Standard v. Swint*, 456 U.S. 273, 288, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) ("[F]indings as

to design, motive and intent with which men act [are] peculiarly factual issues for the trier of fact."); *Dominguez–Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 433 (1st Cir.2000) (finding that "determinations of motive and intent ... are questions better suited for the jury").

Conversely, summary judgment is appropriate where the nonmoving party rests solely upon "conclusory allegations, improbable inferences and unsupported speculation." *Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 95 (1st Cir.1996).

## IV. DISCUSSION AND ANALYSIS

### A. Plaintiff's Sham Affidavit and Defendant's Motion to Strike

On December 23, 2011, Plaintiff filed an affidavit as an attachment to his Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment. (Docket No. 37, Ex. 1). The affidavit was also dated December 23, 2011. The period for discovery closed on September 30, 2011. (Docket No. 24). This affidavit constitutes a sham effort to discredit the facts uncovered by Defendant's depositions and used in its motion for summary judgment. As Defendant sets forth in its motion to strike, jurisprudence abounds eschewing such behavior and the law is well-settled. *See* Docket No. 47 (citing cases); *see also Velazquez–Perez v. Developers Diversified Realty Corp.*, Civil No. 10–1002, Docket No. 131. This filing offends Federal Rule of Civil Procedure 56 and wastes the Court's resources. The Court therefore strikes Plaintiff's affidavit, Docket No. 37, Ex. 1, from the record. Plaintiff's attorney is hereby admonished to *never again* file a sham affidavit before this Court.

The Court notes the remainder of Defendant's claims in its Motion to Strike (Docket No. 48) regarding Plaintiff's proffers of alleged hearsay and offense to the local rules in its qualifications of Defendant's uncontested facts. Although Defendant's Motion to Strike is denied with respect to these particular claims, the Court informs the parties that any discrepancies in factual allegations were resolved by a thorough review of the pleadings exclusive of the parties' statements of facts.

### B. Age Discrimination Under the ADEA

The ADEA prohibits discrimination in public and private employment against individuals who are at least 40 years of age. 29 U.S.C.A. §§ 621–634. ADEA violations may be established by proving either disparate treatment or disparate impact. *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005). Plaintiffs often allege claims under both theories. *See Pottenger v. Potlatch Corp.*, 329 F.3d 740, 749 (9th Cir.2003); *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93 (2d Cir.2001).

Disparate treatment claims under the ADEA may be based on direct or circumstantial evidence, as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas*, a prima facie case of intentional age discrimination may be established by demonstrating that: (1) plaintiff is a member of the protected age group (i.e. at least forty (40) years of age); (2) plaintiff was qualified for the position in question; (3) despite being qualified, plaintiff was adversely affected; and (4) someone younger, with similar or lesser qualifications, was treated more favorably.

The record establishes that Plaintiff was 43 when hired, promoted to the position which he occupied at termination, adversely affected through termination, and that Defendant replaced him with a younger employee. Consequently, Plaintiff estab-

lishes a prima facie case of age discrimination, and the burden shifts to Defendant to offer a legitimate, nondiscriminatory reason for termination.

Defendant proffers nondiscriminatory rationale supporting its decision to dismiss Plaintiff. The record establishes that Plaintiff knowingly breached company policy by disobeying Defendant's decision to use propylene glycol in the Swivel Mold 210, ostensibly running afoul of FDA and OSHA regulations and exposing employees to potentially hazardous leakage. Plaintiff also knew the substance posed health risks and accepted responsibility for its use. Lastly, Plaintiff left Defendant's premises during work hours on November 11, 2011, without informing his supervisor. Each of these instances reflects dereliction of Plaintiff's responsibilities pursuant to his employment agreement with Defendant.

■ Taken in the light most favorable to Plaintiff, the sole instances bordering on age discrimination occurred in conversations between Arroyo and Plaintiff. According to Plaintiff, Arroyo referred to Plaintiff as a "crazy, little, old man" upon every encounter. Plaintiff, however, fails to establish a causal link substantiating Arroyo's impoliteness with meritorious claims. In *Melendez v. Autogermana, Inc.*, Melendez "specifically point[ed] to an incident in which [an employer] called him 'la vieja' ("the old lady") because he wore outdated shoes." 622 F.3d 46, 54–55 & n. 9 (1st Cir.2010). Melendez also attempted to support his claim for discriminatory discharge because employers regularly called him "grandpa" or "the old man." *Id.* "Stray workplace remarks," however, normally are insufficient to establish the requisite discriminatory animus. *Id.* (quoting *Gonzalez v. El Dia, Inc.*, 304 F.3d 63, 69 (1st Cir.2002)). But the Stray Remarks Doctrine does not shield employers from liability when the decision-maker utters the aged-based offenses, particularly when the aggrieved employee alleges consistent aged-based harassment exceeding "stray remarks" at every encounter.

The question thus arises whether Moran or Arroyo ordered Plaintiff's termination. Defendant avers that Moran ordered the discharge, but Arroyo signed the termination letter. Defendant cannot impute Arroyo's behavior to Moran by citing a hierarchical structure. Although Plaintiff's evidence of pretextual intent to terminate is wanting, this termination literally has Arroyo's name written all over it, and Arroyo allegedly made the aged-based remarks. Therefore, the Stray Remarks Doctrine offers Defendants little protection.

Nonetheless, in *Gross v. FBL Fin. Servs.*, the Supreme Court held that a plaintiff must "establish that age was the 'but-for' cause of the employer's adverse action." *Velazquez–Ortiz v. Vilsack*, 657 F.3d 64, 74 (1st Cir.2011) (quoting 557 U.S. 167, 177, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009)). An employment action is considered "adverse" when it " 'results in some tangible, negative effect on the plaintiff's employment' through 'a serious and material change in the terms, conditions or privileges of employment . . .' as viewed by a reasonable person in the circumstances." *Belt v. Alabama Historical Commission*, 181 Fed.Appx. 763 (11th Cir.2006) (citing *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1181–82 (11th Cir.2003)). In determining whether an adverse employment action has occurred, courts must consider the totality of the allegations. *See Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir.1998).

■ Plaintiff fails to carry his burden here. Nothing in the record ties Plaintiff's termination to his age. Plaintiff consistently cites work-based pressure, Arroyo's foul language, and Arroyo's tone

and attitude as the source of his frustration, rather than his age-based remarks. While Arroyo's remarks about Plaintiff's age occurred frequently and without regard to Plaintiff's disdain for Arroyo, the attenuation between Arroyo's aged-based remarks and Plaintiff's allegations of discrimination indicates that no reasonable juror, viewing the facts in the light most favorable to Plaintiff, creates any issue of dispute. Consequently, Plaintiff's ADEA discrimination claim is dismissed.

## C. Disability Discrimination: Plaintiff's Request for Reasonable Accommodation

Plaintiff attempts to withdraw certain claims in his Memorandum of Law in Support of his Opposition to Defendant's Motion for Summary Judgment (Docket No. 37). Plaintiff withdraws allegations regarding disability discrimination, and Defendant's failure to provide a reasonable accommodation to Plaintiff under the ADA and Law 44. He maintains any allegations "related to harassment, discrimination, and retaliation due to plaintiff's requests for a reasonable accommodation under the ADA and Law 44." (*Id.*). Plaintiff's distinction between which claims he maintains and which he withdraws does not clearly delineate which persist; thus, the Court will consider each claim Plaintiff failed to clearly withdraw.

### 1. *Disability Discrimination*

Plaintiff states that he "withdraw[s] his allegations regarding disability discrimination." (Docket No. 37 at 1). Therefore, the Court shall not consider any claims for disability discrimination.

### 2. *Failure to Reasonably Accommodate*

Plaintiff seemingly withdraws his allegations "regarding [D]efendant's failure to

provide a reasonable accommodation to the [Plaintiff]," yet in the very next sentence Plaintiff seeks to "continue with his allegations related to ... discrimination ... due to [P]laintiff's requests for a reasonable accommodation." (Docket No. 37 at 1–2). The statement ostensibly maintains a claim for retaliation based upon the request while withdrawing a claim for failure to reasonably accommodate; however, the Court nonetheless addresses discrimination based on failure to reasonably accommodate because Plaintiff's directive is unclear. "To make out a reasonable accommodation claim, a plaintiff must prove: 1) she was disabled within the meaning of the statute, and; 2) she was qualified to perform the essential functions of the job, either with or without a reasonable accommodation." *Rios–Jimenez v. Principi*, 520 F.3d 31, 41 (1st Cir.2008) (quoting *Calero–Cerezo v. United States Dep't of Justice*, 355 F.3d 6, 20 (1st Cir.2004)). Further, the employer must, despite knowing about the disability, refuse to acquiesce to a request for a reasonable accommodation by the employee. *Id.* As previously stated, Plaintiff withdrew his claim for disability discrimination and neglects to address any of these issues in his submissions to the Court. Therefore, any claim for failure to reasonably accommodate is legally insufficient.

## D. Hostile Work Environment Claim

Plaintiff alleges Defendant created a hostile work environment under both the ADEA and the ADA. To establish a hostile work environment, Plaintiff must show that his workplace was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of ... [her] employment and create an abusive working environment." *Colón–Fontanez v. Mun. of San Juan*, 660 F.3d 17, 43–44 (1st

Cir.2011) (quoting *Quiles–Quiles v. Henderson*, 439 F.3d 1, 7 (1st Cir.2006) (alterations in original) and *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)) (internal quotation mark omitted).

An assessment of whether the work environment is hostile or abusive "must be answered by reference to all the circumstances." *See Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 18 (1st Cir.2002) (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. 367). While " '[t]here is no mathematically precise test to determine whether [a plaintiff] presented sufficient evidence' that she was subjected to a severely or pervasively hostile work environment," *Pomales v. Celulares Telefónica, Inc.*, 447 F.3d 79, 83 (1st Cir.2006) (second alteration in original), courts have recognized the following factors, among others, as relevant in order to detect sufficient pervasiveness to reach the required threshold: (1) the severity of the conduct; (2) its frequency; and (3) whether it unreasonably interfered with the victim's work performance. *Id.; see also Ríos–Jiménez*, 520 F.3d at 43.

The jurisprudence is clear that " 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment' " to establish an objectively hostile or abusive work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).

### 1. *Hostile Work Environment under the ADEA*

Under the ADEA, in order to prevail in a hostile work environment claim, a plaintiff must show evidence demonstrating that: (1) she is a member of the class protected by the ADEA; (2) she was subjected to unwelcome harassment; (3) the harassment was based on age; (4) the harassment was sufficiently pervasive or severe so as to alter the conditions of the plaintiff's employment and create an abusive work environment; (5) the objectionable behavior was both subjectively and objectively offensive such that a reasonable person would find it hostile or abusive; (6) that the plaintiff found it hostile or abusive; and (7) some basis for employer liability has been established. *See Gutiérrez–Lines v. Puerto Rico Elec. and Power Authority*, 751 F.Supp.2d 327, 341–342 (D.P.R.2010) (citing *Marquez v. Drugs Unlimited, Inc.*, 2010 WL 1133808 at *8 (D.P.R.2010) and *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir.2001)); *see also Rodriguez–Torres v. Gov't Dev. Bank of Puerto Rico*, 704 F.Supp.2d 81, 100 (D.P.R.2010). The Court typically looks to the totality of the circumstances, analyzing "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance" in order to determine whether a hostile work environment exists. *O'Rourke*, 235 F.3d at 728–29 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

■ Taking the pleadings in the light most favorable to the Plaintiff, Plaintiff satisfies prongs (1) and (2). Plaintiff is a member of the ADEA-protected class and was subjected to unwelcome harassment by Arroyo. While Plaintiff alleges that Arroyo harassed him by referring to him as an "old man," "crazy old man," "little old man," and "crazy, little, old man," and that Arroyo was foul-mouthed and uncivilized, Plaintiff's claim nonetheless fails at prongs (3) and (4). The age-based harass-

ment Plaintiff alleges did not seemingly alter Plaintiff's employment conditions; rather, Arroyo's rigorous standards and expectations for perfection raised tensions in the workplace to such an extreme that it drove Plaintiff to depression. Arroyo's constant professional demands on Plaintiff, such as calling him at home and frequently monitoring and questioning him to better understand the molding process, bear no connection to the insensitive remarks about Plaintiff's age. Further, there is no evidence linking the harassment in the workplace to a threat to discipline him.

Viewing the record in the light most favorable to Plaintiff and drawing all inferences in his favor, this Court finds lacking any correlation between severe harassment and Arroyo's remarks about Plaintiff's age. "The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins—thick enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world." *Suárez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir.2000). "Federal laws banning [discrimination] 'do[ ] not set forth a general civility code for the American workplace,' and an employee may not base a valid [discrimination] claim on 'petty slights or minor annoyances that often take place at work and that all employees experience.'" *Gómez–Pérez v. Potter*, 452 Fed.Appx. 3 (1st Cir. 2011) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)) (internal citation and quotation marks omitted). Even construing the facts in Plaintiff's favor, as we are required to do under the standard for summary judgment, the evidence does not support a claim of hostile work environment under the ADEA.

### 2. Hostile Work Environment under the ADA

■ The Fourth, Fifth, Seventh, Eighth, and Tenth Circuits recognize as actionable claims for hostile work environment under the ADA. *See Lanman v. Johnson County*, 393 F.3d 1151, 1154–55 (10th Cir.2004) (citing cases); *see also Fox v. GMC*, 247, F.3d 169, 176–77 (4th Cir. 2001) (citing cases). Accordingly, the Court subscribes to this principle of law. "An ADA plaintiff must prove the following to establish a hostile work environment claim: (1) he is a qualified individual with a disability; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer." *GMC*, 247 F.3d at 177. Plaintiff's claim fails under prong (1), because Plaintiff has not attempted to demonstrate he is a qualified individual with a disability; prong (2), because he does not allege harassment arising from his disability; prong (3), because the harassment was based on Arroyo's intense work-place demeanor or Plaintiff's age, and; prong (4), because nothing resulted from any alleged disability-based harassment. Therefore, Plaintiff's hostile work environment claims are dismissed.

### E. Retaliatory Acts under the ADEA and the ADA

Plaintiff also submits Defendant retaliated against him under both the ADEA and the ADA. In a retaliation claim under the ADEA, a plaintiff must demonstrate: 1) she engaged in a protected activity; 2) she suffered an adverse employment action as a result of her participation in said activity, and; 3) a causal connection between those two elements exists. *See Hernández–Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 47 (1st Cir.1998). Courts may also consider other elements, such as the

employer's knowledge of the protected activity and the temporal proximity between the alleged retaliation and the employer's adverse action. *Colón–Fontánez*, 660 F.3d at 37 (quoting *Wyatt v. City of Boston*, 35 F.3d 13, 16 (1st Cir.1994)).

Under the ADA, furthermore, a plaintiff's retaliation claim may succeed even where her disability claim fails. *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 106 (1st Circ.2007). " 'To establish a claim of retaliation, a plaintiff must show that (1) she engaged in protected conduct, (2) she suffered an adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse employment action.' *Id.* And very close temporal proximity between the protected action by the employee and the adverse employment action by the employer may give rise to an inference of causation. *Calero–Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 25 (1st Cir.2004)." *Valle–Arce v. P.R. Ports Auth.*, 651 F.3d 190, 198 (1st Cir.2011).

If a plaintiff makes out a prima facie case of retaliation, a rebuttable presumption of unlawful retaliation arises and "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment decision." *Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003) (citation and quotation marks omitted)n To rebut that presumption, the employer does not have the burden of persuasion, but must simply produce evidence of a legitimate, nondiscriminatory reason for the employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "Once the employer produces such evidence, the presumption 'drops from the case' and the court must focus on the 'ultimate factual issue.' " *Vera v. McHugh*, 622 F.3d 17, 32–33 (1st Cir.2010) (citing *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)).

If the employer successfully meets this burden, the burden shifts again and the plaintiff-employee must then show " 'that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus.' " *Collazo v. Bristol–Myers Squibb Mfg., Inc.*, 617 F.3d 39, 46 (1st Cir.2010) (quoting *Roman v. Potter*, 604 F.3d 34, 39 (1st Cir.2010)). Consequently, the Court assesses Plaintiff's retaliation claims under the ADEA and the ADA under the same standard.

### 1. *ADEA Retaliation*

Plaintiff's claim for retaliation under the ADEA fails. Plaintiff satisfies prongs (1) and (2) of *Intercontintental Trading* by, respectively, levying complaints with the EEOC and Defendant's human resources officer, and ultimately being terminated. However, no causal connection between these two elements exists. A thorough review of the record, drawn in Plaintiff's favor, reveals no indication that Plaintiff suffered any adverse action because of retaliation for complaining to human resources or the EEOC about alleged age discrimination.

■ Even if Plaintiff establishes a prima facie case for retaliation, Defendant successfully carries its burden to demonstrate a legitimate, nondiscriminatory reason for termination and Plaintiff shows no pretextual intent in his submissions. As previously stated, Defendant proffers meritorious, nondiscriminatory rationale supporting its decision to dismiss Plaintiff. To reiterate, Plaintiff admits knowingly breaching company policy by disobeying Defendant's decision to use propylene glycol in the Swivel Mold 210 and introducing a substance that could pose health risks to his subordinates. Plaintiff also left Defen-

dant's premises during work hours on November 11, 2011, without informing his supervisor. Therefore, Plaintiff's claim for retaliation under the ADEA is insufficient as a matter of law. Plaintiff's allegations of pretext, furthermore, are merely conclusory.

### 2. *ADA Retaliation*

Plaintiff's claim for retaliation under the ADA also fails. Plaintiff's assertions that he engaged in protected activity under prong (1) require consideration of two instances of requests for accommodation. First, Plaintiff suffered from an inguinal hernia for several years prior to his dismissal. Secondly, Plaintiff claims he endured severe depression beginning very shortly after his meeting with Arroyo, after which he felt confident that he would be terminated and left Defendant's premises. Plaintiff registered a complaint with the EEOC, which constitutes a protected activity. The parties also dispute whether Plaintiff sufficiently requested a reasonable accommodation for his depression. The court reserves judgment on this matter, as Plaintiff fails to make out a prima facie case for retaliation in both instances, Defendant responds with a legitimate, nondiscriminatory reason for termination, and Plaintiff's allegations of pretextual intent are conclusory at best.

Plaintiff suffered from an inguinal hernia during his tenure with Defendant. He underwent surgery for the hernia on five separate occasions. Plaintiff admits Defendant granted him the time off he requested to convalesce, and that he did not need anything else from the company regarding his hernia. (Docket No. 35, Ex. 3 at 40). Plaintiff suffered from the hernia for "many years" prior to his termination and claims the work-based pressure from Arroyo caused the pain in the hernia to flare up. (*Id.* at 41). He claimed his inguinal hernia flared up whenever Arroyo exerted pressure on him, which motivated him to discuss the matter with Loraine Rosa, a human resources representative with Defendant. Plaintiff's most recently documented leave arising from issues with his hernia ended July 30, 2009. Thus, sufficient temporal proximity exists to shift the burden to Defendant.

Plaintiff also suffers from a "severe emotional condition." (Docket No. 45, Ex. 4). Following his meeting with Arroyo on November 11, 2009, Plaintiff claims he felt so severely depressed that he needed to leave the premises without informing his supervisors, as company policy requires. (Docket No. 45, Ex. 5). On December 1, 2009, he received a certified letter from Dr. Edgardo Prieto–Agostini, M.D. indicating he would "be convalescing from today until March 31, 2010, due to the severity of [his] emotional condition." (*Id.*). Temporal proximity between the letter Plaintiff submitted to Defendant's infirmary on or around December 1, 2009, and Plaintiff's termination on December 23, 2009, therefore exists to shift the burden to Defendant to demonstrate a legitimate, nondiscriminatory reason for dismissal.

■ The Court remains mindful that its role is not to "second-guess the business decisions of an employer, nor to impose [its] subjective judgments of which person would best fulfill the responsibilities of a certain job." *Petitti v. New England Tel. & Tel. Co.*, 909 F.2d 28, 31 (1st Cir.1990). "Courts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 823 (1st Cir.1991). With these principles in mind, the Court restates that Defendant offers several reasons for discharging Plaintiff. Plaintiff's negligence, breach of company policy regarding the use of car coolant, and

leaving the premises without informing a supervisor provide adequate, nondiscriminatory grounds for termination. Nothing in Plaintiff's claims, furthermore, indicate a pretextual intent to terminate. Plaintiff's claim therefore also fails.

### F. Exhaustion of Administrative Remedies and Plaintiff's Claims Under Puerto Rico Law

Because the Court grants Defendant's motion for summary judgment, it does not consider Defendant's assertion that Plaintiff failed to exhaust his administrative remedies. Furthermore, because the Court has granted summary judgment as to all of Plaintiff's federal claims, the Court elects not to exercise jurisdiction over Plaintiff's claims arising under Puerto Rico law.

### V. CONCLUSION

Because Plaintiff's claims cannot succeed as a matter of law, and no rational trier of fact would find in favor of Plaintiff even if all facts are construed in the light most favorable to Plaintiff, the Court **GRANTS** Defendant's motion for summary judgment on all counts. Judgment shall be issued accordingly.

**IT IS SO ORDERED.**