# United States Court of Appeals
## For the First Circuit

No. 22-1089

ALMARIS SERRANO-COLON,

Plaintiff, Appellant,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY; RICHARD
MALDONADO; ALEJANDRO MAYORKAS, in his official capacity as
Secretary of the Department of Homeland Security,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Silvia Carreño-Coll, U.S. District Judge]

Before

Kayatta, Lipez, and Thompson, Circuit Judges.

Edgardo J. Hernández Ohárriz, with whom Hernandez-Oharriz &
Santiago, P.S.C. was on brief, for appellant.

Gabriella S. Paglieri, Assistant United States Attorney, with
whom W. Stephen Muldrow, United States Attorney, Mariana E. Bauzá-
Almonte, Assistant United States Attorney, Chief, Appellate
Division, and Francisco A. Besosa-Martínez, Assistant United
States Attorney, were on brief, for appellees.

November 13, 2024

**LIPEZ**, **Circuit Judge**. Almaris Serrano-Colon ("Serrano") claims in this employment discrimination action that she was terminated from her position as a Transportation Security Officer ("TSO") because of her disability, gender, and parental status. She further alleges retaliation based on her filing complaints with the Equal Employment Opportunity Commission ("EEOC"). Her former employer, the Transportation Security Administration ("TSA"), attributes her firing to Serrano's years of erratic attendance, including dozens of tardies and unscheduled absences, and her failure to improve despite receiving several letters warning of possible consequences if her attendance problems persisted. The district court granted summary judgment for TSA on each of Serrano's claims.[1] After careful review of the record, we affirm.

## I.

In this appeal from the district court's grant of summary judgment, we consider the facts in the light most favorable to Serrano, the nonmoving party. See Ing v. Tufts Univ., 81 F.4th 77, 79 (1st Cir. 2023).

---

[1] Serrano sued the Department of Homeland Security ("DHS"), the Secretary of DHS, and one of her managers, Richard Maldonado. TSA is an administrative agency housed within DHS. We refer collectively to the defendants as "TSA."

## A. Transportation Security Officers

TSA is responsible for securing our nation's transportation systems. With respect to airline operations, TSA employs TSOs to screen travelers and luggage at security checkpoints in federal airports, the goal being to mitigate threats to aviation security. TSOs must meet several conditions of employment, including demonstrating the ability to lift and carry items weighing up to seventy pounds, walk up to two miles during a shift, and stand for prolonged periods. As part of the screening process, TSA protocol requires some TSOs to "pat down" certain travelers flagged for additional searching. Because "pat-downs" are typically performed by a TSO of the same gender as the traveler, TSA needs sufficient TSOs of each gender at security checkpoints.

TSA maintains an attendance policy applicable to its employees nationwide, including TSOs. That policy outlines, among other things, how TSOs may use their annual and sick leave and details the circumstances under which they can take leave without pay ("LWOP"). Subject to TSA's national policy, local TSA offices may develop their own guidelines for attendance and the use of leave. During Serrano's employment, local TSA attendance policy generally mandated that TSOs obtain prior approval for all absences from duty, including requests for LWOP. For scheduled absences, TSOs had to submit requests at least seven days in advance, and

unscheduled absences required at least sixty minutes of advanced notice. However, an exception to the sixty-minute requirement applied if the employee was "incapacitated" or faced "other exigent circumstances." In such a case, the employee was required to notify management of the absence "as soon as possible."

Under the applicable national and local policies, TSOs could be required to provide "administratively acceptable" documentation to support the use of leave for a medical condition covered by sick leave. Determining whether documentation was "administratively acceptable" was within the discretion of management and could vary based on the circumstances. A TSO who took an unapproved absence, including by failing to provide "administratively acceptable" documentation to support the absence, could be deemed "AWOL" -- that is, absent without leave. The determination of AWOL status is not itself a disciplinary action but may serve as the basis for a disciplinary action. TSA policy also stated that the disciplinary action for successive attendance offenses generally should fall within the "aggravated penalty" range, which could include termination.[2]

---

[2] The parties agree on this reading of the policy, which appears in the record in the Declaration of José Rivera. However, the "aggravated penalty" range is not defined in TSA's attendance policy as excerpted by the parties.

**B. Serrano's Employment and First EEOC Complaint**

In 2007, Serrano began working part-time as a TSO at the Mercedita/Ponce International Airport ("PSE") in Puerto Rico. Throughout her tenure as a TSO, Serrano was a single mother to two children. Serrano claims that she was diagnosed with fibromyalgia in 2008, just months into her TSA employment.[3]

Serrano's work schedule typically consisted of five days of work with two consecutive days off (a "five-on-two-off schedule"). In 2009, Transportation Security Manager ("TSM") Richard Maldonado began permitting Serrano to work four days per week with three consecutive days off (a "four-on-three-off schedule"),[4] an adjustment Serrano stated would allow her to rest and deal with treatments for her fibromyalgia.[5] In April 2010, however, TSA headquarters notified TSA management in Puerto Rico that this four-day workweek did not comply with TSA guidelines.

---

[3] Fibromyalgia is a medical condition that causes fatigue and muscle pain throughout one's body. While there is no cure for fibromyalgia, its symptoms can be treated with various medications. Yet those medications may create problems of their own. Serrano states that her fibromyalgia medications, for instance, caused her to experience migraines, dizziness, and sleep deprivation.

[4] Serrano's supervisors also included team leader Juan Martínez, Supervisory TSO Lyanne Díaz, TSM Layda Rodríguez, and TSM Myriam Rodríguez.

[5] Even with her treatments, Serrano endured one to two flare-ups from her condition per month, with each episode lasting a few days. Serrano did not work during those flare-ups.

As a result, Serrano resumed her five-on-two-off schedule around April 10, 2010.

From 2010 until her removal in 2015, Serrano's supervisors granted many of her requests for paid and unpaid leave, permitting her to deal with personal needs and take vacations. During this period, TSA also raised concerns about Serrano's attendance record, warning her on multiple occasions that the frequency of her unscheduled absences and late arrivals could result in disciplinary action. Because Serrano's TSA employment history as relevant to this appeal is complex, we will lay out the facts in discrete time periods, beginning in 2010.

### 1. 2010 to 2011

Serrano's attendance issues began in the first half of 2010. Between January and June, Serrano requested ten unscheduled absences, four of which fell immediately before or immediately after her days off, thus effectively extending her "weekend."[6] Notably, six of Serrano's ten absences occurred before April 2010, while she had a modified work schedule. Additionally, Serrano did not provide the required notice in advance of four of her unscheduled absences, three of which were prior to April 2010.

---

[6] Serrano invoked the Family and Medical Leave Act ("FMLA") for all but one of these absences. TSA's FMLA policy entitled qualifying TSOs to take twelve weeks of unpaid leave every twelve months. Serrano requested and was approved for FMLA leave in 2008, 2009, 2011, and 2012.

As a result, in July 2010, Serrano was issued her first "letter of counseling."[7] The letter explained that Serrano was expected to arrive on time for her assigned shifts. The letter also cautioned that additional unexcused absences could result in leave restrictions or disciplinary action, including removal. Though most of Serrano's unscheduled absences prior to the letter's issuance were approved as FMLA leave, the letter informed Serrano that the FMLA does not authorize excessive unscheduled and unpredictable absences.

During the next two months, August and September 2010, Serrano accumulated three more unscheduled absences for which she did not provide the required advanced notice. Consequently, Serrano's supervisor issued Serrano a "letter of guidance" in November 2010, referencing the seven occasions from January to September when she was absent without alerting management at least sixty minutes in advance and citing Serrano for "unacceptable performance" for her failure to follow TSA's leave policy.

Around this time, a dispute arose between Serrano and her supervisors regarding some of her absences for which she did provide the requisite notice. In October and November 2010, Serrano called out of work in advance on five occasions -- October

_____

[7] The issuance of a "letter of guidance" or "letter of counseling" is a non-disciplinary action intended to notify an employee of conduct that should be corrected or improved.

24, October 29, October 30, November 1, and November 6. She asked that each of these absences be processed as LWOP. However, Maldonado coded the absences as AWOL. Believing these five absences were improperly classified, Serrano wrote a letter to Maldonado "self-certifying" that her absences were due to her chronic medical condition.[8] Serrano did not provide medical evidence or documentation, such as a physician's note, along with her letter. Serrano was eventually told that TSA management did not find her documentation sufficient to warrant recoding her absences.[9]

In total, between October 9 and December 13, 2010, Serrano accumulated eleven unscheduled absences, including the five absences coded as AWOL, and one tardy. As a result, TSA management issued Serrano two letters in January 2011. On January 11, 2011, Serrano was issued a "letter of leave restriction,"[10] which explained that Serrano's "pattern of unscheduled absences"

---

[8] TSA policy provides that administratively acceptable evidence to support an absence may include "[d]ocumentation such as employee self-certification, medical documentation, or other documentation sufficient to warrant approval of a leave request." The policy further states that "[t]he supervisor or designated management official will determine if the documentation submitted is administratively acceptable. The type of administratively acceptable documentation may vary based on the timing, type and length of a request."

[9] The parties dispute whether Serrano's "self-certification" satisfied the TSA documentation requirement.

[10] Serrano received this letter on January 17, 2011.

had disrupted airport operations. The letter stated that Serrano would need to produce a certificate from her physician for each illness-related absence immediately upon her return to work. Finally, the letter warned Serrano that additional unapproved absences may result in administrative action, including removal. On January 29, 2011, Serrano received a "letter of reprimand," signed by two managers, stating that she was being "officially reprimand[ed]" for the absences identified in the letter of leave restriction.[11] The letter of reprimand emphasized again the importance of following the established leave procedures and minimizing requests for unscheduled leave.

On January 18, 2011 -- the day after she received the letter of leave restriction, but before she received the letter of reprimand -- Serrano emailed Maldonado and another supervisor asking to return to a four-on-three-off schedule. Though Serrano did not reference her medical condition in that email, both supervisors were aware of Serrano's fibromyalgia. Shortly thereafter, Serrano learned that TSA headquarters was responsible for approving accommodations of this type, so she submitted her request for a reduced work schedule through the "TSA Headquarters Reasonable Accommodation Program" in February 2011. Serrano

---

[11] TSM Layda Rodríguez signed this second letter on January 12, 2011, the day after she signed Serrano's "letter of leave restriction." TSM Myriam Rodríguez signed the second letter three days later, on January 15.

supplemented her request with a letter from her physician describing the effects of fibromyalgia. TSA's Office of Human Capital -- the department charged with processing medical accommodations -- received her request in March 2011.

In April 2011, while Serrano's request for a modified schedule was pending, she filed a complaint with the EEOC based on disability discrimination. She alleged that Maldonado's refusal to remove the AWOL classification on her five absences in late October and early November 2010, despite knowing that she had fibromyalgia, was discriminatory. Her complaint also challenged the "letter of leave restriction" and "letter of reprimand" issued to her due to those absences. Serrano and TSA later entered into a settlement agreement under which TSA agreed to remove six hours of AWOL from Serrano's record and approve those hours as FMLA/LWOP instead. In exchange, Serrano agreed to waive her "right to pursue administrative or judicial action in any forum concerning matters relating to the [2011 EEOC] Complaint."

As for Serrano's requested accommodation, TSA's Office of Human Capital informed Serrano in a letter dated October 13, 2011, that because her "treating physician indicated that [she] may return to work with no restrictions but may require time off for [her] medical appointments," it determined Serrano had no medically related work restrictions that required accommodation. Accordingly, the Office of Human Capital denied Serrano's request

to modify her schedule.  The Office of Human Capital also reminded Serrano to request medical leave in advance to attend appointments in accordance with established leave procedures.

### 2. 2012 to 2014

Less than a year after Serrano's request for a medical accommodation was denied, all TSOs at PSE were given the option to work a four-on-three-off schedule.  Serrano was on this modified schedule from June 2012 to February 2013.  Despite this reduction in hours, Serrano's attendance problems persisted.  During this period, she took 61.75 hours of leave without pay and used 23 hours of sick leave.

Around this time, in May 2012, another TSO at PSE wrote a letter to Maldonado alleging that Serrano was in a relationship with one of her supervisors, Lead TSO Juan Martínez.  The letter alleged that with the help of Martínez, Serrano had altered her attendance records in TSA's timekeeping system.  Following an internal investigation, Serrano was charged with submitting inaccurate time and attendance reports, being tardy, and failing to follow instructions.  TSA management issued Serrano a notice of removal on these grounds.[12]  But in November 2013, an internal TSA appellate board reduced Serrano's penalty to a fifteen-day suspension.

_____

[12] The record does not identify which members of management, specifically, made the decision to remove Serrano.

In August 2013, Serrano requested reduced work hours "due to personal needs" to accommodate her health, childcare obligations, and graduate studies. Assistant Federal Security Director José Rivera denied this request, citing PSE's operational requirements.[13] Serrano renewed her request for a reduced schedule in February 2014. This time, Rivera informed Serrano via email that the request would need to be made to, and approved by, the Federal Security Director. After speaking with her direct supervisors, Serrano replied to Rivera's email -- copying the Federal Security Director -- reiterating her request for reduced hours.[14]

Meanwhile, Serrano continued to struggle with attendance. From October 28, 2013, to May 10, 2014, Serrano was late for work on seven occasions. During that same period, TSA recorded eleven occasions on which Serrano requested an unscheduled absence, including at least four occasions on which Serrano made the request less than sixty minutes before the start of her shift. Serrano disputes whether all these unscheduled absences occurred, but she admits that at least some happened as recorded.

---

[13] Rivera was Serrano's fifth-line supervisor. He was responsible for screening operations at five airports, including PSE.

[14] It is not clear from the record whether the Federal Security Director considered Serrano's request.

In response to these absences, Serrano's supervisor issued Serrano a second "letter of sick leave restriction" in May 2014.[15] The letter explained that Serrano needed to request scheduled leave, including sick leave for medical appointments, at least seven days in advance. It also advised her of two requirements in the case of sudden illness: (1) to contact her supervisors at least one hour before the beginning of her shift to explain the need for unscheduled leave and (2) to produce medical documentation from her physician for each absence. Finally, the letter warned Serrano that failure to improve her attendance record could result in her removal.

### 3. 2015

By January 20, 2015, TSA had recorded ten unscheduled absences for Serrano during the five months prior, seven of which were not reported sixty minutes before her shift. Serrano again disputes whether each of these ten absences occurred as recorded. Serrano was issued another letter of leave restriction -- her third -- on January 20, 2015. The letter, mirroring prior letters of this type, notified Serrano that any failure to properly request leave or timely provide medical documentation upon her return could

---

[15] This was the only letter issued to Serrano labeled a letter of sick leave restriction. However, its provisions were identical to the prior and subsequent letters of leave restriction.

result in a charge of AWOL or disciplinary action, including removal.

In early 2015, Serrano became pregnant, and she informed her immediate supervisor that her due date was in late November. While Serrano was pregnant, she was on light duty, which typically consists of working in roles that allow the employee to be seated and do not involve heavy lifting. Between January 21 and June 18, Serrano accumulated twenty-six unscheduled absences. As a result, Serrano was issued her fourth letter of leave restriction in late July. Maldonado also categorized some of Serrano's absences in 2015 as AWOL.

Serrano claims that many of her absences in 2015 were due to her continued struggle with fibromyalgia and her pregnancy. Indeed, Serrano's fibromyalgia-related symptoms of nausea, dizziness, fatigue, infections, weakness, and pain worsened during her pregnancy.

In April 2015, Serrano requested twenty hours of advanced sick leave due to her worsening pregnancy symptoms, explaining that she was experiencing signs of a miscarriage and her gynecologist had ordered her to remain on bed rest until May 1. However, Rivera denied that request, citing Serrano's continuously low leave balance and his lack of confidence that the advanced leave would be repaid. Roughly two months later, in June, Serrano requested a reduced work schedule because of her childcare

obligations, graduate studies, and health. This request also was denied, with the explanation that the reduction in hours would be inconsistent with the agency's need to staff sufficient personnel to cover screening operations at PSE.

**C. Serrano's Second EEOC Complaint and Termination**

Serrano contacted an EEOC counselor for the second time in March 2015 and filed a second complaint with the EEOC in June 2015. In this complaint, Serrano alleged that she was subject to harassment and disparate treatment based on her sex, disability, parental status, or prior 2011 EEOC activity when she was denied various requests for a reduced work schedule and other types of leave.

On July 26, 2015, Serrano was issued a Notice of Proposed Removal primarily based on her attendance record. The proposed removal charged Serrano with (1) failing to follow agency leave procedures by not requesting several unscheduled absences at least sixty minutes prior to her shift, (2) failing to follow the instructions in the letters of sick leave restriction by not providing the requisite notice in advance of unscheduled absences, (3) arriving late for work, and (4) being AWOL due to not providing documentation to justify several unscheduled absences.

In her reply to the Notice, Serrano explained that she was pregnant and had a disability with symptoms that became exacerbated during pregnancy. She also explained that she believed

the prior attendance-related actions against her were based on her pregnancy and/or disability and constituted discrimination. Finally, she claimed that her disability and pregnancy were mitigating factors for what she believed were unavoidable absences and late arrivals.

Serrano nonetheless was removed from federal service in August 2015. She appealed to an internal TSA board, which affirmed her removal. The EEOC subsequently accepted for investigation Serrano's additional allegation that she was subject to discrimination in the form of her removal from service.[16]

## D. Procedural History

Serrano filed suit in federal court in February 2016, asserting claims under Title VII, the Rehabilitation Act, the Administrative Procedure Act ("APA"), the Fifth Amendment, and the Puerto Rico Civil Code.[17] She alleged that, from 2008 to 2011, she was denied reasonable accommodations for her disability (fibromyalgia), encountered roadblocks to obtaining FMLA leave, and had a number of absences wrongly marked as AWOL. Serrano also averred that, from 2013 to 2015, TSA management violated federal

---

[16] Serrano states in her Amended Complaint that the EEOC issued a notice of right to sue on November 13, 2015.

[17] Serrano does not argue on appeal that the district court erred in granting summary judgment for TSA on her claims under the APA, the Fifth Amendment, or Puerto Rico law. Nor does she press on appeal her purported disability discrimination claim under Title VII. We therefore do not address those claims.

and Commonwealth law when they denied her reduced schedule requests, placed her on sick leave restriction requiring medical documentation to support such requests, did not give her advanced sick leave or leave without pay, improperly coded her AWOL, and eventually terminated her. According to Serrano, these actions constituted discrimination based on disability, gender, and parental status, and retaliation for filing EEOC complaints.

After discovery, TSA moved for summary judgment on all claims. On the Title VII claims, TSA argued that Serrano could not make out a prima facie case, and that, even if she could, TSA had legitimate, nondiscriminatory reasons for the actions taken against her. TSA asserted that the Rehabilitation Act claims were precluded under the Aviation and Transportation Security Act ("ATSA"), Pub. L. No. 107-71, 115 Stat. 597 (2001) (codified primarily in scattered sections of 49 U.S.C.), and that even if those claims were cognizable, they failed on the merits.

The district court entered summary judgment against Serrano on all claims.[18]

## II.

We review the district court's grant of summary judgment de novo. Ferrari v. Vitamin Shoppe Indus. LLC, 70 F.4th 64, 69

---

[18] The district court initially granted summary judgment in TSA's favor on all but Serrano's Title VII sex discrimination claim. Both parties moved the court to reconsider its decision. On reconsideration, the court granted TSA's motion on all claims.

(1st Cir. 2023).  Summary judgment is warranted only when the record reveals no genuine issue as to any material fact, and judgment is proper as a matter of law.  Motorists Com. Mut. Ins. v. Hartwell, 53 F.4th 730, 734 (1st Cir. 2022).  A plaintiff opposing summary judgment "bears 'the burden of producing specific facts sufficient to'" defeat summary judgment.  Theidon v. Harvard Univ., 948 F.3d 477, 494 (1st Cir. 2020) (quoting Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003)).

## A. Title VII Discrimination

Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on an "individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a); see also id. § 2000e-16 (forbidding such discrimination in employment by the federal government).  By prohibiting discrimination "on the basis of sex," the statute also makes it unlawful for employers to discriminate "on the basis of pregnancy, childbirth, or related medical conditions."  Id. § 2000e(k).  Title VII does not prohibit discrimination based on disability.  See id. § 2000e-2(a).

Serrano argues that TSA discriminated against her based on her sex, pregnancy status, and parental status when it denied her requests for a modified schedule and ultimately removed her from service.[19]  In evaluating whether we can infer discrimination

---

[19] While Title VII does not expressly prohibit discrimination based on parental status or caregiver responsibility, we have held

- 18 -

under Title VII from the undisputed facts, we apply the well-known three-step McDonnell Douglas burden-shifting framework. See Diaz v. City of Somerville, 59 F.4th 24, 28, 32 (1st Cir. 2023) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). Under that framework, Serrano first "must put forth evidence from which a reasonable juror could find that she had established a prima facie case of discrimination under Title VII." Paul v. Murphy, 948 F.3d 42, 49 (1st Cir. 2020). Namely, she must identify evidence "that: (1) she belonged to a protected class, (2) she performed her job satisfactorily, (3) her employer took an adverse employment decision against her, and (4) her employer continued to have her duties performed by a comparably qualified person." Id. (quoting Bonilla-Ramirez v. MVM, Inc., 904 F.3d 88, 94 (1st Cir. 2018)).

If Serrano succeeds in making out a prima facie case, "[t]he burden of production then 'shifts to the [defendants] to state a legitimate, nondiscriminatory reason for the adverse employment action[s].'" Id. (first alteration in original) (quoting Burns v. Johnson, 829 F.3d 1, 9 n.8 (1st Cir. 2016)). If

_____

that an employer's "assumption that a woman will perform her job less well due to her presumed family obligations is a form of sex-stereotyping and that adverse job actions on that basis constitute sex discrimination." Chadwick v. WellPoint, Inc., 561 F.3d 38, 44 (1st Cir. 2009) (citing Nev. Dep't of Hum. Res. v. Hibbs, 538 U.S. 721, 730 (2003)). We will therefore analyze Serrano's claim of discrimination because of parental status under the umbrella of sex discrimination.

TSA articulates such a justification, it is entitled to summary judgment unless Serrano raises a genuine issue of material fact that "the reasons offered by [the defendants] were a pretext for discrimination." Luceus v. Rhode Island, 923 F.3d 255, 258 (1st Cir. 2019) (alteration in original) (quoting Ray v. Ropes & Gray LLP, 799 F.3d 99, 113 (1st Cir. 2015)).

The plaintiff always retains "[t]he ultimate burden of persuasion." Cham v. Station Operators, Inc., 685 F.3d 87, 94 (1st Cir. 2012). While "[w]e proceed with caution and restraint when considering summary judgment motions where, as here, issues of motive and intent must be resolved[,] . . . 'summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" Theidon, 948 F.3d at 496 (quoting Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1121 (1st Cir. 1995)).

In evaluating Serrano's discrimination claim, we may advance directly to the second step of the McDonnell Douglas analysis, assuming without deciding that Serrano can establish a prima facie case. See, e.g., Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 120 (1st Cir. 2024) (adopting same approach); Brader v. Biogen, Inc., 983 F.3d 39, 55 (1st Cir. 2020) (same). TSA proffers that it denied Serrano's requests for reduced hours due to operational needs and terminated Serrano because of her chronic absenteeism, lateness, and failure to follow TSA's leave

procedures. We agree with the district court that TSA has produced ample evidence of these "legitimate, nondiscriminatory reason[s]" for its actions. See Paul, 948 F.3d at 49. As detailed above, that evidence includes the content of the numerous letters TSA sent Serrano, as well as the declarations and testimony of Serrano's supervisors. Thus, TSA has carried its burden on step two.

Moving to the third and last step of the McDonnell Douglas framework, "we ask[] whether, after assessing all of the evidence on the record in the light most favorable to [Serrano], she has raised a genuine issue of material fact as to whether [TSA]'s stated reason[s] for" its actions "w[ere] merely pretext for discrimination." Theidon, 948 F.3d at 497. To do so, Serrano "must offer 'some minimally sufficient evidence, direct or indirect, both of pretext and of [TSA's] discriminatory animus.'" Pearson v. Mass. Bay Transp. Auth., 723 F.3d 36, 40-41 (1st Cir. 2013) (quoting Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 140 (1st Cir. 2012)). "[I]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; [the plaintiff] must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination." Theidon, 948 F.3d at 497 (quoting Vélez v. Thermo King de P.R., Inc., 585 F.3d 441, 452 (1st Cir. 2009)).

The district court held that Serrano did not carry her burden to show pretext, reasoning that Serrano had not directed the court either "to any evidence showing weaknesses, implausibilities, inconsistencies, or contradictions in [TSA's] proffered legitimate reasons, or any evidence showing that [TSA] did not believe [its] 'stated reason to be credible.'" Serrano-Colón v. Dep't of Homeland Sec., No. 16-1268, 2021 U.S. Dist. LEXIS 258903, at *15 (D.P.R. Dec. 22, 2021) (citation omitted) (quoting Brader, 983 F.3d at 57). Instead, the district court found that Serrano "merely speculates" that her absences were pretext for TSA's actions against her. Id. at *16.

On appeal, Serrano argues that the district court did not appropriately consider her evidence in context. She insists that the pretextual nature of TSA's reliance on her attendance record to justify its actions is apparent because TSA consciously failed to "provide the accommodation she needed" to avoid those absences. That is, Serrano claims her absences were "deliberately stimulated by [TSA] through the constant denial of reasonable accommodations" to "cover [TSA's] discriminatory animus." But Serrano points to no facts to support such a finding. Quite the opposite, the evidence supports TSA's position that her requests for a modified schedule were denied because the agency was short-staffed and needed Serrano to be present at her job. Moreover, the undisputed facts show that Serrano's attendance issues existed

even while she was enjoying the four-on-three-off schedule that she says would have sufficed as a reasonable accommodation. Serrano does not explain how TSA "stimulated" her troubling attendance record by denying her accommodation requests when her absenteeism persisted notwithstanding her modified schedule. Serrano otherwise offers mere conclusory assertions that her absences were used as a pretext for her removal. That conjecture is not enough to support a finding of pretext. See Pearson, 723 F.3d at 40.

Nor does Serrano point to evidence that would permit a reasonable factfinder to conclude that TSA harbored discriminatory animus. In her memorandum opposing TSA's motion for summary judgment, Serrano identified as evidence of such animus a comment relayed to her by another TSO that "they" stated, "There she comes. Now she's pregnant." But as the district court explained, see Serrano-Colón, 2021 U.S. Dist. LEXIS 258903, at *17, this "[i]solated, ambiguous remark[] [is] insufficient, by [it]self, to prove discriminatory intent," Zabala-De Jesus v. Sanofi-Aventis P.R., Inc., 959 F.3d 423, 430 (1st Cir. 2020) (first alteration in original) (quoting Lehman v. Prudential Ins. Co. of Am., 74 F.3d 323, 329 (1st Cir. 1996)). Moreover, Serrano neither identified who "they" were nor suggested the context of "the[ir]" remarks. See Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002) ("[S]tray workplace remarks, as well as statements made either by

nondecisionmakers or by decisionmakers not involved in the decisional process, normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus." (quotation marks omitted)); Paul, 948 F.3d at 54 (indicating that one stray remark, without additional context, cannot support a finding of discriminatory intent). Thus, we agree with the district court that this evidence is not enough to raise a genuine issue of material fact as to TSA's discriminatory intent.

Serrano alternatively argues that the fact of her termination during a high-risk pregnancy is enough on its own to establish TSA's discriminatory animus and, therefore, her entitlement to relief under Title VII. She asserts in her brief: "If that is not sex discrimination at face value, [I] don't know what is." This argument, however, ignores entirely Serrano's problematic attendance record. TSA has presented evidence of Serrao's frequent absenteeism, repeated failure to notify her supervisors of her absences in advance, and noncompliance with TSA's requests for adequate documentation to support her absences. It has also pointed to numerous warnings to Serrano that failing to improve her attendance could result in disciplinary action, including removal. That Serrano's removal coincided with her high-risk pregnancy would not permit a finder of fact to overlook her lengthy history of erratic attendance that preceded the termination decision. While we are sympathetic to the challenges

no doubt created by her removal from service while enduring a high-risk pregnancy, Serrano's difficulties do not provide a valid rationale for defeating an otherwise meritorious motion for summary judgment.

Because Serrano has failed to carry her burden to create a triable issue of fact as to both pretext and discriminatory animus, we affirm the district court's decision granting summary judgment for TSA on Serrano's Title VII discrimination claim.

## B. Title VII Retaliation

"Title VII expressly forbids not only direct discrimination, but also retaliation against an individual who has complained about discriminatory employment practices." Kinzer, 99 F.4th at 114-15 (quoting Velazquez-Ortiz v. Vilsack, 657 F.3d 64, 72 (1st Cir. 2011)). "To prevail on a retaliation claim, the employee 'need not prove that the conditions against which [the employee] protested actually amounted to a violation of Title VII.'" Id. at 115 (quoting Fantini v. Salem State Coll., 557 F.3d 22, 32 (1st Cir. 2009)). That is, an employee may still have a viable retaliation claim under Title VII even if the employee's discrimination claim fails. See id.

We again look to the McDonnell Douglas framework when evaluating Serrano's Title VII retaliation claim. To establish a prima facie case of retaliation, Serrano must prove: "(1) she engaged in protected conduct; (2) she was subjected to an adverse

employment action; and (3) the adverse employment action is causally linked to the protected conduct." Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 94 (1st Cir. 2018). "An employee has engaged in activity protected by Title VII if she has either (1) opposed any practice made an unlawful employment practice by Title VII or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII." Fantini, 557 F.3d at 32 (quotation marks omitted) (quoting Long v. Eastfield Coll., 88 F.3d 300, 304 (5th Cir. 1996)); see also id. ("'[P]rotected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." (quoting Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000))).

As the district court noted, see Serrano-Colón, 2021 U.S. Dist. LEXIS 258903, at *18, disability discrimination is not an "unlawful employment practice" under Title VII, so Serrano's 2011 EEOC complaint alleging only disability discrimination cannot serve as the basis for her Title VII retaliation claim. See Fantini, 557 F.3d at 32 (affirming dismissal of plaintiff's Title VII retaliation claim because opposed conduct was not unlawful employment practice under Title VII). Accordingly, Serrano can challenge only the adverse actions that occurred after she contacted an EEOC counselor in 2015 to complain of, inter alia, gender and pregnancy discrimination. See Torres-Negrón v. Merck

- 26 -

& Co., 488 F.3d 34, 44 (1st Cir. 2007) ("An employee has engaged in an activity protected by Title VII if she has . . . opposed any practice made unlawful by Title VII . . . ." (emphasis added)); see also 42 U.S.C. § 2000e-3(a).

Serrano indisputably engaged in protected conduct when she contacted the EEOC in 2015, and we will once again assume without deciding that she can prove the remaining elements of her prima facie case. See Kinzer, 99 F.4th at 120. Accordingly, the burden shifts to TSA to "articulate a legitimate, non-retaliatory reason for its employment decision[s]." Calero-Cerezo v. U.S. Dep't of Just., 355 F.3d 6, 26 (1st Cir. 2004). TSA has done so, identifying specific reasons for the employment actions against Serrano that have "nothing to do with any impulse to retaliate against her for protected conduct." Id. TSA has pointed to Serrano's poor attendance record as a legitimate justification for denying her advanced leave requests and ultimately dismissing her. TSA has also stated that it denied Serrano's June 2015 request for reduced work hours due to its operational needs in light of staffing constraints.

Thus, the burden shifts back to Serrano to "show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." Id.; see also Harrington v. Aggregate Indus.-Ne. Region, Inc., 668 F.3d 25, 31 (1st Cir. 2012) ("[T]o succeed here the appellant must

have adduced sufficient evidence to create a genuine issue as to whether retaliation was the real motive underlying h[er] dismissal."). Pretext and retaliatory animus may be shown by "deviations from standard procedures, the sequence of occurrences leading up to a challenged decision, and close temporal proximity between relevant events." Harrington, 668 F.3d at 33.

Serrano fails to carry her burden on the pretext and retaliation requirements. Indeed, she offers no separate argument in support of her Title VII retaliation claim, merely asserting her claim is one of "retaliation/discrimination" without elaborating or distinguishing between the theories. Consequently, her retaliation claim fails for the same reasons as her discrimination claim. She points to no evidence that TSA's proffered reasons for the employment actions against her were pretextual or that such actions were motivated by retaliatory animus, relying on nothing more than mere speculation and conclusory assertions. See Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (explaining that summary judgment is appropriate where "the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation").

We therefore conclude that the district court properly granted summary judgment for TSA on Serrano's Title VII retaliation claim.

## C. Rehabilitation Act

The Rehabilitation Act aims to "prohibit discrimination against an otherwise qualified individual based on his or her disability." Calero-Cerezo, 355 F.3d at 19.[20] Before turning to the merits of Serrano's claims under that statute, however, we address TSA's argument that, under our precedent and the relevant statutory framework, we lack jurisdiction to consider them.

### 1. The Availability of Rehabilitation Act Claims to TSA Employees

Shortly after the terrorist attacks of September 11, 2001, Congress enacted the Aviation and Transportation Security Act ("ATSA") with the goal of improving "the safety and security of the civil air transportation system." Field v. Napolitano, 663 F.3d 505, 508 (1st Cir. 2011) (quoting H.R. Rep. No. 107–296, at 39 (2001), reprinted in 2002 U.S.C.C.A.N. 589, 590 (Conf. Rep.)). Under the ATSA, Congress created the TSA, giving the new agency sweeping responsibility for airport security screening and vesting

---

[20] Serrano refers only to the Americans with Disabilities Act ("ADA") in her briefing. We presume she intended to raise her disability-based claims under the Rehabilitation Act because "the ADA applies to private employers with over 15 employees and state and local governments," not federal agencies. Calero-Cerezo, 355 F.3d at 19. The Rehabilitation Act, on the other hand, governs "federal agencies, contractors[,] and recipients of federal financial assistance." Id. "The same standards, however, apply to claims under the ADA and under the Rehabilitation Act." Id. at 11 n.1.

the TSA Administrator with the authority to carry out the provisions of the statute.[21]

In relevant part, the ATSA provides:

> Notwithstanding any other provision of law, the Under Secretary of Transportation for Security [now Administrator of the Transportation Security Administration] may employ, appoint, discipline, terminate, and fix the compensation, terms, and conditions of employment of Federal service for such a number of individuals as the Under Secretary determines to be necessary to carry out the screening functions [required by the Act].

49 U.S.C. § 44935 note (first alteration in original). The ATSA contains two additional "notwithstanding" clauses that set forth minimum qualifications for the job of TSA screener, id. § 44935(e)(2)(A), and specify, inter alia, physical requirements that TSA screeners must meet, id. § 44935(f)(1).

In Field, decided in 2011, we held that "the unequivocally plain language of the ATSA" "precludes security screeners from bringing suit under . . . the Rehabilitation Act." 663 F.3d at 512. We drew support for our holding in part from the Supreme Court's observation that "notwithstanding" clauses generally signal Congress's intention to "override conflicting provisions of any other section." Id. at 511 (quoting Cisneros v.

---

[21] As we have noted, "[a]lthough the ATSA refers to the 'Under Secretary of Transportation for Security' as the head of the TSA, the position has since been given the title 'Administrator of the Transportation Security Administration.'" Field, 663 F.3d at 508 n.2 (citing 49 C.F.R. § 1500.3).

_Alpine Ridge Grp._, 508 U.S. 10, 18 (1993)).  We concluded that the ATSA provisions enumerating physical qualifications for TSA screeners and giving the TSA Administrator authority to establish other physical requirements are incompatible with allowing screeners to bring suit under the Rehabilitation Act.  _Id._ at 511-12.  We also noted that "[e]very circuit to address the issue has agreed" with our holding.  _Id._ at 512.

The preemptive effect of the ATSA over Rehabilitation Act claims has been questioned, however, in light of Congress's enactment in 2012 of the Whistleblower Protection Enhancement Act ("WPEA"), Pub. L. No. 112-199, 126 Stat. 1465 (2012), which is housed within the Civil Service Reform Act ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111 (1978) (codified as amended in scattered sections of 5 U.S.C.).  In a provision titled "Prohibited personnel practices affecting the Transportation Security Administration," the WPEA provides that "[n]otwithstanding any other provision of law, any individual holding or applying for a position within the [TSA] shall be covered by . . . the provisions of section 2302(b)(1)."  5 U.S.C. § 2304(a).  Section 2302(b)(1), in turn, lists certain "Prohibited personnel practices" under the CSRA, including disability discrimination under the Rehabilitation Act.  _Id._ § 2302(b)(1)(D).  The WPEA further extends to TSA employees "any provision of law implementing section 2302(b)(1)."  _Id._ § 2304(a)(2).

The district court concluded that the WPEA "granted Rehabilitation Act protections to TSA employees" like Serrano. Serrano-Colón, 2021 U.S. Dist. LEXIS 258903, at *24. In addition to the statute's language, the court found relevant the legislative history of the WPEA, id., in which the Senate Committee specifically noted that the statute "extends to TSA employees the protections against the prohibited personnel practices listed under 5 U.S.C. § 2302(b)(1)" of the CSRA, including discrimination "on the basis of handicapping condition under the Rehabilitation Act," S. Rep. No. 112-155, at 20 (2012), reprinted in 2012 U.S.C.C.A.N. 589, 608.

The district court then went on to discuss the procedure that governs certain types of claims brought under the CSRA, including a requirement to exhaust administrative remedies before seeking judicial review.[22] Although the district court concluded that Serrano had likely failed to comply with the required procedures, it also determined that her failure to exhaust was an

---

[22] The district court considered Serrano's claims to constitute a "mixed case." Serrano-Colón, 2021 U.S. Dist. LEXIS 258903, at *24. A mixed case under the CSRA is defined as a "serious" personnel action -- e.g., removal -- that the employee alleges was based on discrimination prohibited by another federal statute. Kloeckner v. Solis, 568 U.S. 41, 44 (2012) (citing 29 C.F.R. § 1614.302). An employee bringing a mixed case must exhaust administrative remedies before seeking judicial review in federal district court. Id. at 45. TSA contends that the district court erred in viewing Serrano's claims to present a mixed case, but we need not resolve that debate. See infra.

affirmative defense for which TSA bore the burden of proof. Serrano-Colón, 2021 U.S. Dist. LEXIS 258903, at *24-26. The court held that TSA did not provide sufficient evidence to satisfy that burden, and it therefore went on to consider the merits of Serrano's Rehabilitation Act claims. See id. at *26.

On appeal, the parties debate whether Field's holding that TSA screeners may not bring Rehabilitation Act claims remains binding precedent that forecloses Serrano's claims. Although multiple circuits have held even after the WPEA's enactment that the ATSA precludes TSA employees from bringing claims under the Rehabilitation Act, no circuit -- including our own -- has analyzed the impact of the WPEA on that conclusion. See, e.g., Galaza v. Mayorkas, 61 F.4th 669, 673 (9th Cir. 2023) (per curiam); Kaswatuka v. U.S. Dep't of Homeland Sec., 7 F.4th 327, 330 (5th Cir. 2021); Coleman v. Sec'y U.S. Dep't of Homeland Sec., 649 F. App'x 128, 129-30 (3d Cir. 2016) (per curiam).[23]

---

[23] The district court identified only one case where a court analyzed how the WPEA's provisions interact with the ATSA, and that court held that the WPEA permits screeners to bring Rehabilitation Act claims consistent with the CSRA's provisions. See Ruedas-Rojas v. McAleenan, No. 19-CV-2252, 2020 WL 6143652, at *5 (S.D. Fla. June 1, 2020). After the district court issued its opinion in this case, another court in the Southern District of Florida undertook the same analysis but came out the opposite way. See Simone v. Sec'y of Homeland Sec., 2023 WL 2734232, at *4-5 (S.D. Fla. Mar. 31, 2023), appeal docketed, No. 23-11411 (11th Cir. Apr. 28, 2023).

TSA maintains that the WPEA provides only "certain limited employment protections to TSA security screeners" and requires the screeners to bring the permitted claims through the CSRA's regime for addressing less serious "Prohibited personnel practices" under § 2302(b).[24]  That regime includes submitting claims first to the Office of Special Counsel and then, in some cases, proceeding to the MSPB.  Roberts v. U.S. Dep't of Just., 366 F. Supp. 2d 13, 18 (D.D.C. 2005); accord Irizarry v. United States, 427 F.3d 76, 77-78 (1st Cir. 2005).  Only after the employees have exhausted the administrative remedies may they seek judicial review, Irizarry, 427 F.3d at 79-80, which, depending on the circumstances, may occur "either in the Federal Circuit or in 'any court of appeals of competent jurisdiction,'" Zachariasiewicz v. U.S. Dep't of Just., 48 F.4th 237, 243 (4th Cir. 2022) (quoting 5 U.S.C. § 7703(b)(1)(B)).

In sum, TSA argues that (1) the WPEA does not restore a cause of action under the Rehabilitation Act to TSA screeners; (2) the WPEA creates a narrow mechanism through which TSA screeners can seek remedies for certain adverse employment decisions; and (3) that mechanism requires TSA screeners to initiate claims

[24] TSA asserts that the WPEA does not confer on TSA screeners the rights and remedies applicable to more serious adverse actions that form the basis for mixed cases.  While we do not address this contention, we find it unlikely that Congress would allow TSOs redress for less serious actions but leave them without remedy for more significant harms.

administratively before seeking review by federal appellate courts of competent jurisdiction. Because Serrano did not comply with these procedures, TSA argues that she cannot bring suit in federal court.[25] Moreover, TSA asserts that, even if Serrano had exhausted her administrative remedies, she would have been required to initiate her federal suit in a court of appeals -- not in the district court -- so this court lacks jurisdiction to hear her appeal.

For her part, Serrano defends the district court's ruling allowing her to bring her Rehabilitation Act claims, and she asserts that TSA has waived its argument that we lack jurisdiction to hear her appeal by failing to file a cross-appeal challenging jurisdiction. While we generally must assure ourselves of our own jurisdiction even if the parties do not contest it, see Anversa v. Partners Healthcare Sys., Inc., 835 F.3d 167, 174 n.5 (1st Cir. 2016), we decline to resolve the jurisdictional issue.

As we have described, this appeal presents questions of first impression for our court as to whether, and to what extent, the WPEA restored Rehabilitation Act protections to TSA screeners,

---

[25] TSA also contends that the district court erred in holding that administrative exhaustion is an affirmative defense rather than a jurisdictional prerequisite. This distinction has no bearing on our analysis, see infra, so we decline to address TSA's assertion.

what administrative requirements apply to any such permissible claims under the statute, and, ultimately, whether we have jurisdiction to hear Serrano's appeal. "The rule is well established in this [c]ircuit that resolution of a complex jurisdictional issue may be avoided when the merits can easily be resolved in favor of the party challenging jurisdiction." Cozza v. Network Assocs., Inc., 362 F.3d 12, 15 (1st Cir. 2004); see also Anversa, 835 F.3d at 175 ("Such an approach -- bypassing the jurisdictional inquiry -- is preferable here. The statutory exhaustion analysis is complex and uncertain, and its outcome would have no bearing on the ultimate result . . . ."). This is such a case. As we explain below, Serrano's Rehabilitation Act claims plainly fail on the merits.

Of course, we may bypass the jurisdictional inquiry only if the Article III case or controversy requirement is not implicated. See Restoration Pres. Masonry, Inc. v. Grove Eur. Ltd., 325 F.3d 54, 59-60 (1st Cir. 2003) (collecting cases). Because federal question jurisdiction exists in this action "arising under the . . . laws . . . of the United States," see 28 U.S.C. § 1331, and Serrano clearly has a personal stake in the outcome of this action, see Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012), Article III jurisdiction is satisfied. We therefore bypass the multiple questions concerning Serrano's right

to bring those claims, including her right to appeal their dismissal to us, and proceed to the merits.

## 2. Serrano's Claims Under the Rehabilitation Act

Serrano raises three claims on appeal under the Rehabilitation Act.[26] First, she asserts that TSA subjected her to discrimination by terminating her due to her disability. Second, she claims that TSA failed to adopt her requested accommodation for her disability. Third, she avers that TSA fired her in retaliation for complaining to the EEOC about alleged disability discrimination in 2011. We address each claim in turn.

In evaluating Serrano's claim of disability discrimination under the Rehabilitation Act, we again turn to the McDonnell Douglas burden-shifting framework. See Ríos-Jiménez v. Principi, 520 F.3d 31, 40 (1st Cir. 2008). To put forth a prima facie discrimination claim, Serrano must show that (1) "she was disabled within the meaning of the statute;" (2) "she was qualified to perform the essential functions of the job, either with or without a reasonable accommodation;" and (3) "the employer took adverse action against her because of the disability." Id. at 41. Similarly, to make out a prima facie failure to accommodate claim, Serrano must prove the first two of the above three elements while

---

[26] Serrano initially alleged an additional hostile work environment claim under the Rehabilitation Act. However, she has not pressed this claim on appeal, so we do not address it.

also establishing that her employer, "despite knowing about [her] disability, did not acquiesce to [her] request for a reasonable accommodation." Id.; see also Calero-Cerezo, 355 F.3d at 20 (providing prima facie elements of failure to accommodate claim); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999) (same).

The district court entered summary judgment in TSA's favor on both Serrano's discrimination and failure-to-accommodate claims. Assuming without deciding that Serrano's fibromyalgia is a disability within the meaning of the Rehabilitation Act, the court held that Serrano had "not produced evidence showing that an 'accommodation would have enabled her to perform the essential functions of [her] job.'" Serrano-Colón, 2021 U.S. Dist. LEXIS 258903, at *27-28 (quoting Ríos-Jiménez, 520 F.3d at 41). The court explained that Serrano "provided no evidence beyond her own say-so that a reasonable accommodation would have allowed her to be present for her job," noting that "even with the accommodation [Serrano] had requested (i.e., a four-day work week), she was often absent." Id. at *28. Thus, the district court concluded Serrano failed to prove her prima facie case under McDonnell Douglas. We agree.

Serrano argues that the district court erred by ignoring evidence that she received her highest performance reviews when she was permitted to work only four days per week. Indeed, the

- 38 -

record reflects that Serrano consistently received positive performance evaluations throughout her tenure as a TSA screener. But her proficiency when she was present at work does not necessarily mean Serrano was able to perform the essential functions of her job. See Colón-Fontánez v. Municipality of San Juan, 660 F.3d 17, 33 (1st Cir. 2011) ("[O]ur 'qualified individual' inquiry does not end with an evaluation of the quality of [the plaintiff's] work performance."). We have "recognized that 'attendance is an essential function of any job.'" Id. (quoting Ríos-Jiménez, 520 F.3d at 42). The record makes clear that Serrano's physical presence at her job was an indispensable expectation and requirement. Serrano's role as a TSA employee required her to screen passengers and their property at PSE, including, at times, by physically patting down passengers of her same gender. Serrano's supervisors declared that TSA relies on TSOs like Serrano to come to work as scheduled, as unplanned absences can result in operational burdens and unnecessary delays for travelers.

The record reveals that Serrano cannot show she met this essential function. TSA has produced voluminous evidence of Serrano's frequent absenteeism, which persisted even while she was enjoying a modified four-on-three-off schedule. See id. at 35-36 (concluding plaintiff did not meet second element of prima facie disability discrimination case where her attendance levels did not

improve despite various accommodations); cf. Valle-Arce v. P.R. Ports Auth., 651 F.3d 190, 200 (1st Cir. 2011) (holding plaintiff carried her burden on second element of failure-to-accommodate claim where she presented evidence she had never been reprimanded about her attendance while on flexible schedule). TSA has also produced evidence that it repeatedly advised Serrano of the agency's attendance policy, evaluated her attendance as unsatisfactory, and warned her that she might incur consequences for her poor attendance record. Thus, notwithstanding Serrano's ability to satisfactorily perform her job as a TSO when she was present, her poor attendance rendered her unable to satisfy her position's essential functions. See Colón-Fontánez, 660 F.3d at 34-35 (holding that regardless of plaintiff's "noted skills or experience, her extensive absenteeism rendered her unqualified to perform her position's functions"). She therefore cannot establish a prima facie case of discrimination or failure to provide reasonable accommodations under the Rehabilitation Act. Thus, we affirm the district court's grant of summary judgment in TSA's favor on Serrano's discrimination and reasonable accommodation claims.

Finally, we turn to Serrano's retaliation claim under the Rehabilitation Act. Because we are guided by our Title VII analysis, our reasoning above regarding Serrano's retaliation claim under Title VII dooms her claim here. See Kelley v. Corr.

Med. Servs., Inc., 707 F.3d 108, 115 (1st Cir. 2013) (noting that "guidance on the proper analysis of [an] ADA retaliation claim is found in Title VII cases" (alteration in original) (quoting Soileau v. Guilford of Me., Inc., 105 F.3d 12, 16 (1st Cir. 1997))). Accordingly, we agree with the district court that TSA is entitled to summary judgment on Serrano's retaliation claim.

***

For the foregoing reasons, we affirm the district court's grant of TSA's motion for summary judgment on all counts.

So ordered.